1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10
11
12
13

KYNTREL TREVYONE JACKSON,

                        Plaintiff,

          v.

SHAWNA PATZKOWSKI, et al.,

                        Defendants.

Case No. C18-1508-RSM-MLP

REPORT AND RECOMMENDATION

14              **I.      INTRODUCTION**

15    Plaintiff, a state prisoner currently housed at the Stafford Creek Corrections Center, is

16  proceeding *pro se* in this 42 U.S.C. § 1983 civil rights action in which he alleges 23 current and

17  former employees of the Washington State Department of Corrections ("DOC") violated his

18  statutory and constitutional rights. (Compl. (Dkt. # 6); Am. Compl. (Dkt. # 72).)[1] Plaintiff's

19  claims arose when he was housed in the Intensive Management Unit ("IMU") at the Monroe

20  Correctional Complex ("MCC") in 2016 and in the IMU at the Washington State Penitentiary

21  _____

22  [1] Pursuant to the Honorable James P. Donohue's February 26, 2019 Order, Plaintiff's original and
amended complaints are to be considered together. (Dkt. # 71.) Specifically, the Court relies on the facts
as alleged in the amended complaint and the requests for relief asserted in the original complaint. Because
23  the original complaint was signed under penalty of perjury, and the facts alleged in the amended
complaint are materially identical to those alleged in the original complaint, the Court considers the
amended complaint to be verified, as well.

("WSP") from late 2016 to 2018. He alleges violations of the Religious Land Use And Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 200cc, *et seq.*, the First Amendment's Free Exercise Clause, the First Amendment's prohibition on retaliation, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and the Eighth Amendment's Cruel and Unusual Punishment Clause. (*See generally* Am. Compl.) He seeks damages and injunctive relief. (Compl. at 46-48.)

Currently before the Court is Defendants' motion for summary judgment (Mot. (Dkt. # 138)), which Plaintiff opposes. (Resp. (Dkt. # 169).) In their reply, Defendants move to strike numerous attachments to Plaintiff's response. (Reply (Dkt. # 173).) Plaintiff filed an opposition to the motion to strike (Surreply (Dkt. # 178)) and supplemental evidence (dkt. # 177). Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that Defendants' motion for summary judgment be GRANTED in part and DENIED in part, as explained below.

## II.     BACKGROUND

Plaintiff brings claims related to: (1) the rejection of four religious books; (2) his requests for other religious literature, addresses, and items; (3) alleged rapes/sexual assaults by DOC staff and resulting retaliation and destruction of property; (4) alleged retaliation and discrimination by several DOC staff; and (5) alleged interference with the grievance process. (*See generally* Am. Compl.) The evidence regarding these claims is detailed below.

### A.     Rejection of Religious Books

Plaintiff is Satanic and has been practicing his religion for over ten years. (Am. Compl. at 1.) The only Satanic religion officially recognized by the DOC is the Church of Satan, and its holy book, *The Satanic Bible*, is on the DOC's approved publications list. (Ivey Decl. (Dkt.

# 147) at ¶ 5.) Plaintiff started out following the Church of Satan and owns a copy of *The Satanic Bible*, but he is not a member of the Church of Satan and now practices a different form of Satanism. (*See* Jackson Depo. (Dkt. # 141-1) at 1-33[2]; Ivey Decl. at ¶ 5.) Although the record is not entirely clear what form of Satanism Plaintiff practices, he identified the "Order of Nine Angels" as his religion in 2016. (*See* Jackson Depo. at 31-45; Ivey Decl. at ¶ 5.)

In 2016 and 2017, Plaintiff ordered four Satanic books that were rejected by mailroom staff. (*See* Am. Compl. at 1-4.) Plaintiff alleges the rejection of these books violated his rights under RLUIPA, the Free Exercise Clause, and the Equal Protection Clause. (*See id.*) After setting forth the relevant DOC policies, the Court discusses the facts surrounding the rejection of each book.

### 1.    *Relevant DOC Policies*

DOC Policy 450.100 Mail for Prison Offenders governs the DOC's rejection of incoming publications. (*See* DOC Policy 450.100 (Dkt. # 148-1, Ex. 1).) The DOC requires publications to be sent directly from the publisher, an approved vendor, or an approved non-profit. (*Id.* at 13.) Mailroom employees inspect and read incoming mail to prevent inmates from receiving "contraband or other material that threatens facility order or security, and/or . . . [c]riminal activity." (*Id.* at 6.) "Mail will be rejected based on legitimate penological interests and per Unauthorized Mail (Attachment 1)." (*Id.*) Unauthorized Mail provides that mail may be rejected for 40 different reasons, including that it "[c]ontains plans for activity that violates state/federal law, the Washington Administrative Code, Department policy, and/or facility procedures," "[c]ontains information that could create a risk of physical harm to the individual or another person if the communication were allowed," or "[a]dvocates violence against others and/or the

---

[2] The Court cites to the CM/ECF page numbers of Plaintiff's deposition.

1  overthrow of authority." UNAUTHORIZED MAIL (DOC 450.100 Attachment 1), ¶¶ 9, 16, 20,

2  *available at* https://www.doc.wa.gov/corrections/incarceration/send/mail.htm (last viewed

3  6/23/2020).

4          When a mailroom employee rejects a publication, he or she must provide written notice

5  to the inmate explaining the basis for the rejection and the appeals process. (DOC Policy 450.100

6  at 11.) When a publication is rejected because it does not come from the publisher, an approved

7  vendor, or non-profit, the inmate may submit a written appeal request, which is reviewed by the

8  Superintendent. (*Id.* at 12.) If the Superintendent upholds the rejection, the offender may submit

9  a written appeal request, which will be reviewed by the DOC Headquarters Correctional

10  Manager. (*Id.*) At the time of the rejections at issue in this case, the Correctional Manager was

11  Defendant Israel "Roy" Gonzalez ("Mr. Gonzalez"). (Schneider Decl. (Dkt. # 150) at ¶ 2.) After

12  his retirement in 2019, his assistant, Defendant Tracey Schneider, took over as the Correctional

13  Manager. (*Id.*)

14          When a publication is rejected because it includes content that violates DOC policy, the

15  rejection is automatically referred for review by the DOC Headquarters Publication Review

16  Committee.[3] (DOC Policy 450.100 at 14; Patzkowski Decl. (Dkt. # 153-1) at ¶ 6.) The mailroom

17  must scan the questionable pages from the publication for review. (DOC Policy 450.100 at 15.)

18  The Review Committee is primarily guided by DOC Policy 450.100 and may prohibit any

19  publication that presents legitimate concerns for the safety and security of both staff and inmates.

20  (Schneider Decl. at ¶ 5.) If the Review Committee determines that a publication should be

21  prohibited, the publication goes on the DOC's list of publications that are rejected by mailrooms

22  in all DOC facilities unless there is a successful appeal by the inmate. (*Id.*; Schneider Decl. at

23  

---

[3] None of the members of the Publication Review Committee at the time Plaintiff's books were rejected are named as Defendants in this action. (*See* Schneider Decl. at ¶ 5.)

1  ¶ 5.) If the Review Committee determines that the publication is not prohibited, it allows the

2  inmate to receive the publication unless there is a successful appeal by the mailroom. (DOC

3  Policy 450.100 at 15; Schneider Decl. at ¶ 5.) Any appeal of the Review Committee's decision is

4  decided by the Correctional Manager. (Schneider Decl. at ¶ 6.)

5              2.      *The Devil's Notebook*

6         In early June 2016, Plaintiff ordered a copy of *The Devil's Notebook*. (Am. Compl. at 1.)

7  When the book arrived at the MCC, mailroom staff contacted Defendant Henri Fischer, the MCC

8  Chaplain, to determine whether it was appropriate for Plaintiff to receive. (Fischer Decl. (Dkt.

9  # 142) at ¶ 3.) Chaplain Fischer advised that the DOC recognizes Satanism as a religion but that

10  he was unfamiliar with *The Devil's Notebook*. (*Id.*) Chaplain Fischer asked to review the book to

11  see if there was anything in it that might be considered degrading or inappropriate by DOC

12  standards. (*Id.*) After review, Chaplain Fischer provided his opinion to mailroom Correctional

13  Officer Tammy O'Reilly and Sergeant James Palmer that it did not appear to comply with

14  DOC's policies because it contained a hymn that celebrated murdering Christians and therefore

15  advocated violence. (*Id.* at ¶ 4.) On June 9, 2016, Officer O'Reilly rejected the book, explaining

16  that "[t]he content includes violent song lyrics referencing religious groups and violence toward

17  any religious groups." (Dkt. # 142-1 at 8.)

18         After receiving the rejection notice, Plaintiff approached MCC staff to explain that the

19  book was rejected for the same material contained in the Christian Bible. (Am. Compl. at 1-2;

20  *see also* Resp. at 30-32.) On or about October 13, 2016, Officer O'Reilly notified Plaintiff that

21  the MCC Superintendent had reviewed and upheld the rejection. (Resp. at 29.) Although the

22  rejection should have been automatically referred to the Review Committee because it was based

23

1   on the book's content, the DOC Headquarters does not have any records regarding the rejection

2   of *The Devil's Notebook*. (Schneider Decl. at ¶ 3.)

3       In January 2020, Ms. Schneider reviewed *The Devil's Notebook* and determined Plaintiff

4   could be allowed to receive a copy, which counsel for Defendants mailed to him in response to

5   his discovery requests. (Second Carr Decl. (Dkt. # 174) at ¶ 3; Dkt. # 174-1 at 2.)

6       Plaintiff names Chaplain Fischer, Mr. Gonzalez, Ms. Schneider, and DOC Headquarters

7   employee Tim Thrasher as Defendants under this claim. (Am. Compl. at 2-3.)

8                    3.    *Encyclopedia of Hell*

9       In June 2016, Plaintiff ordered the *Encyclopedia of Hell*. (Am. Compl. at 1.) On June 10,

10  2016, Officer O'Reilly rejected the book, explaining that "it is not from an approved vendor . . . .

11  The outside of the package has the stamp 'Amazon.com' but the address is not matched to an

12  approved vendor." (Resp. at 35.) On June 17, 2016, Plaintiff filed a kite asking to appeal the

13  rejection because it was from an approved vendor. (*Id.* at 36.) Officer O'Reilly noted the appeal.

14  (*Id.*) Plaintiff followed up with a grievance and another kite. (*Id.* at 37, 39.) He was told to

15  rewrite the grievance because he had not explained what was rejected, when the rejection

16  occurred, or who rejected it. (*Id.* at 39.) Plaintiff filed a rewrite but was told to rewrite it again

17  because he failed to explain what was rejected, who rejected it, and whether there was a rejection

18  notice. (*Id.* at 38.) There is no evidence in the record that Plaintiff filed a properly accepted

19  grievance.

20      Plaintiff names Chaplain Fischer, Mr. Gonzalez, Ms. Schneider, and Mr. Thrasher as

21  Defendants under this claim. (Am. Compl. at 1-3.)

22

23

1

        4.     *The Most Gruesome Hauntings*

2

     On December 5, 2016, WSP mailroom employee Defendant Deanna Baker rejected a

3

copy of *The Most Gruesome Hauntings* that was sent to Plaintiff from the nonprofit LGBT

4

Books to Prisoners because LGBT Books to Prisoners was not an approved nonprofit. (Baker

5

Decl. (Dkt. # 139) at ¶ 3; *see also* Dkt. # 139-1 at 2.) Ms. Baker did not reject the book because

6

of its content. (Baker Decl. at ¶ 3.) The rejection was upheld by Defendant WSP Superintendent

7

Donald Holbrook and by Mr. Gonzalez. (*Id.*; Schneider Decl. at ¶ 8; Dkt. # 150-1 at 4.)

8

     Plaintiff names Ms. Baker, Superintendent Holbrook, Mr. Gonzalez, Ms. Schneider,

9

Shawna Patzkowski, Alisa Ridenour, Carla Schettler, Sammi Muecke, Lonnie Roberts, Joni

10

Aiyeku, Chaplain Frederic Ivey, Donald Caldwell, Tanner Mink, and Melanie Romine as

11

Defendants under this claim. (Am. Compl. at 3-4.)

12

        5.     *Grimorium Verum*

13

     In July 2017, Plaintiff ordered a copy of the *Grimorium Verum*, one of the required texts

14

for his religion. (*See* Jackson Depo. at 39-41; Am. Compl. at 3.) WSP mailroom employee

15

Defendant Shawna Patzkowski reviewed the book, which included a disclaimer stating in part,

16

"Part of the fascination of this text is no doubt due to the many grotesque and criminal elements,

17

such as using a human skull and blood." (Patzkowski Decl. at ¶ 7.) This caused her concern, so

18

she examined the book more closely. (*Id.*) On July 19, 2017, Ms. Patzkowski issued a rejection

19

notice, explaining:

20

> Policy 450.100 Mail will be rejected based on legitimate penological interests, including those outlined in Unauthorized Mail.

21

22

> Book contains instructions on rituals using human blood, skulls, and bones; sacrificing animals (goats, roosters, hens, pigeons); instructions on using knives and needles for certain rituals; and mind manipulation and power over females using rituals and potions.

23

WAC 137-25-030-506 – Threatening another with bodily harm or with any offense against person or property.

(Dkt. # 150-1 at 2.)

Pursuant to DOC policy, Ms. Patzkowski's rejection was automatically referred to the Review Committee, which reviewed the numerous passages in the book that were of concern to Ms. Patzkowski, agreed that the passages presented a potential threat to the safety and security of staff and/or inmates, and upheld the rejection. (Patzkowski Decl. at ¶ 6; Schneider Decl. at ¶ 6.) Plaintiff appealed, and Mr. Gonzalez upheld the decision, explaining:

> The basis for the offender's appeal is that the book is religious and contains similar information to that of the Satanic Bible. DOC Policy 560.200 Attachment 1 provides a list of allowable religious books/literature. This particular book is not on that list as an allowable item; therefore, it was sent in for review to the Committee. The book contains information/instructions as noted [by Ms. Patzkowski]. Once reviewed, it was determined to be a threat to legitimate penological objectives if the instructions were to be carried out in a facility setting.

(Resp. at 43; *see also* Schneider Decl. at ¶ 7.)

On November 17, 2017, Plaintiff filed a § 1983 civil rights action in the U.S. District Court for the Eastern District of Washington regarding the rejection of the *Grimorium Verum* and seeking as his sole relief that he be allowed a copy of the book. *Jackson v. Patzkowski*, No. 4:17-cv-5189-SMJ, Dkt. # 1 (E.D. Wash. Nov. 17, 2017). The Honorable Salvador Mendoza, Jr., screened the amended complaint and allowed Plaintiff to proceed on RLUIPA and First Amendment free exercise claims against Ms. Patzkowski and WSP employee Richard Zaragoza. *Id.*, Dkt. # 21. During discovery, Judge Mendoza ordered the DOC to allow Plaintiff to review the book for two hours per week. (*See* Schneider Decl. at ¶ 7.) On November 8, 2019, Judge Mendoza granted summary judgment in Mr. Zaragoza's favor, denied summary judgment in favor of Ms. Patzkowski, and took under consideration whether to grant partial summary judgment to Plaintiff on his RLUIPA claim. *Jackson*, Dkt. # 169.

1    In response to Plaintiff's litigation, Ms. Schneider decided to take the *Grimorium Verum*

2  off the DOC's list of prohibited publications and provide Plaintiff with a copy. (Schneider Decl.

3  at ¶ 7.) On November 21, 2019, Judge Mendoza dismissed Plaintiff's case as moot, noting that

4  the only relief he requested was delivery of the book and that he received the book on November

5  13, 2019. *Jackson*, Dkt. # 177 at 4.

6    In this action, Plaintiff names as Defendants Ms. Patzkowski, Superintendent Holbrook,

7  Mr. Gonzalez, Ms. Schneider, Ms. Baker, Ms. Ridenour, Ms. Schettler, Mr. Muecke, Ms.

8  Roberts, Ms. Aiyeku, Chaplain Ivey, Mr. Caldwell, Mr. Mink, and Ms. Romine. (Am. Compl. at

9  3-4.)

10    **B.    Other Religious Literature, Addresses, and Items**

11    Plaintiff brings RLUIPA, First Amendment free exercise, and equal protection claims

12  related to requests he made for religious literature, addresses, and items. (*See* Am. Compl. at 4-5,

13  14-16.) The Court summarizes the relevant DOC policies and then sets forth the facts

14  surrounding each claim below.

15    *1.    Relevant DOC Policies*

16    DOC Policy 560.200 is the principle policy concerning inmates' religious practices.

17  (DOC Policy 560.200 (Dkt. # 147-1, Ex. 2); Ivey Decl. at ¶ 4.) The policy provides for "religious

18  as well as cultural opportunities for offenders within available resources, while maintaining

19  facility security, safety, health, and orderly operations." (DOC Policy 560.200 at 15.)

20    When the inmate's faith is not represented by the facility chaplain or volunteers, the

21  chaplain "may assist the offender in contacting a religious leader with the appropriate credentials

22  from the faith group." (DOC Policy 560.200 at 18.) Additionally, if volunteers from a particular

23

1  faith group are not available, "offenders may request faith group materials through recognized

2  organizations." (*Id.*)

3         Inmates in the general population are allowed to possess religious items listed in DOC

4  Policy 560.200 Attachment 1. (DOC Policy 560.200 at 23; Ivey Decl. at ¶ 4.) Inmates in IMUs,

5  however, must get permission from both a Chaplain and IMU custody staff to be allowed any

6  religious items except for a few items listed in DOC Policy 320.255, such as a small religious

7  medallion and a small medicine bag. (Ivey Decl. at ¶ 4; DOC Policy 320.255 (Dkt. # 147-1, Ex.

8  3) at 35-36.)

9                    *2.      Religious Literature and Addresses*

10        In late 2016, Plaintiff contacted WSP Chaplain Ivey to obtain addresses and materials

11 concerning his stated religion, the "Order of Nine Angels." (Ivey Decl. at ¶ 5.) Plaintiff alleges

12 that he presented four websites to Chaplain Ivey where religious literature and items could be

13 purchased but Chaplain Ivey "refused the website[s]."[4] (Am. Compl. at 14.) According to

14 Chaplain Ivey, Plaintiff's requests for Satanic addresses and materials went beyond addresses

15 and materials related to a religion officially recognized by the DOC. (Ivey Decl. at ¶ 5.)

16 Nevertheless, Chaplain Ivey attempted to accommodate Plaintiff's requests by printing over 100

17 pages of "Order of Nine Angels" materials from the internet for Plaintiff between June 2017 and

18 October 2017. (*Id.*; Dkt. # 169-2 at 92.)

19        In September 2017, Plaintiff filed Grievance # 17640400 in which he complained that

20 Chaplain Ivey had not responded to numerous kites requesting religious literature. (Dkt. # 169-5

21 at 62.) On October 2, 2017, the grievance coordinator responded that the Chaplain had answered

22 Plaintiff's kites, provided over 100 pages of religious materials, and was not always able to

23

---

[4] Those websites are "www.LuciferianWitchCraft.com," "www.EsotericArchives.com,"
"www.LLEWLLYN.com," and "www.Necronomi.com." (Am. Compl. at 14.)

1   respond as quickly as Plaintiff wanted due to his other responsibilities. (*Id.*) In his appeal,

2   Plaintiff recognized the materials Chaplain Ivey had provided but complained that he had

3   received nothing the previous three months. (*Id.* at 63.) On October 18, 2017, Superintendent

4   Holbrook denied the appeal, concluding that Chaplain Ivey had gone above and beyond what

5   was required by DOC Policy 560.200. (*Id.*)

6          On October 27, 2017, Chaplain Ivey sent Plaintiff a letter summarizing the religious

7   materials he had already provided, setting forth the requirements of DOC Policy 560.200, and

8   informing Plaintiff he would no longer print internet pages for Plaintiff. (Dkt. # 169-2 at 92.)

9   Chaplain Ivey also provided Plaintiff with two addresses for Satanic organizations that he had

10  found on the internet. (Ivey Decl. at ¶ 5; Dkt. # 169-2 at 69, 92.) One of these addresses would

11  not provide the religious materials and literature Plaintiff sought. (Am. Compl. at 15.) Plaintiff's

12  letter to the second address was returned undelivered. (*Id.*) Plaintiff thus alleges Chaplain Ivey

13  failed to provide him with any way to receive religious materials. (*Id.* at 5, 15-16.)

14                    *3.    Religious Items*

15         In July 2017, Plaintiff filed Grievance # 17637188 in which he alleged he had been

16  denied the following religious items: tarot deck, altar cloth, parchment, silver or wood chalice,

17  black scrying mirror, earth, salt, and a medallion. (Dkt. # 145-1 at 2.) According to Plaintiff,

18  inmates of other religions are allowed similar items. (Am. Compl. at 5.)

19         The grievance coordinator responded that DOC Policy 560.200 allows IMU inmates to

20  request unapproved religious materials and suggested Plaintiff write a letter to the DOC

21  Headquarters. (Dkt. # 145-1 at 5.) Plaintiff's appeal was assigned to WSP Associate

22  Superintendent Chris Bowman, who consulted with Chaplain Ivey regarding the response. (*See*

23  *id.* at 4.) On September 11, 2017, Associate Superintendent Bowman responded that Plaintiff

1    needed to follow the process outlined in the policy to obtain permission to have the items in the

2    IMU. (*Id.* at 4.) Plaintiff appealed to the DOC Headquarters, which upheld the determination and

3    informed him that he needed to "provide the name and address of an outside religious authority

4    of [his/her] religious faith group to the Chaplain on DOC 21-142 Religious Requirement

5    Information Sheet. The Chaplain will send a copy of the form to the religious authority to

6    complete and return, verifying the request is consistent with faith standards." (*Id.* at 6 (quoting

7    DOC Policy 560.200).) Plaintiff alleges he filed the proper religious item request with the DOC

8    Headquarters but never heard a response. (Am. Compl. at 5.)

9        Plaintiff names Chaplain Ivey, Superintendent Holbrook, and WSP Corrections Officer

10   Anthony Gonzalez ("Officer Gonzalez") as Defendants under this claim. (Am. Compl. at 4-5.)

11   **C.    Alleged Rapes/Sexual Assaults, Retaliation, and Property Damage**

12       Plaintiff brings RLUIPA, First Amendment free exercise, retaliation, Equal Protection

13   Clause, and Eighth Amendment Cruel and Unusual Punishment Clause claims against Officer

14   Gonzalez, Correctional Program Manager ("CPM") Steven Sundberg, Correctional Unit

15   Supervisor ("CUS") Scott Buttice, CUS Charles Pease, and Corrections Officer Jerry Dunleavy.

16   (Am. Compl. at 21.)

17       Plaintiff alleges that approximately four times between August and December 2016,

18   Officer Gonzales, who was the property officer in the IMU South unit at the WSP,

19   "raped/sexually assaulted" him with CPM Sundberg, CUS Buttice, and Officer Dunleavy

20   "partaking in the assault." (Am. Compl. at 17, 19.) Plaintiff alleges Officer Gonzalez's sexual

21   assaults were both verbal and physical. (*Id.*) He recounts that the first assault occurred when he

22   asked for a religious book and his address book, and Officer Gonzalez told him he would have to

23   perform "sexual acts," specifically "oral sex, [i]nvoluntary strip tease, & hand jobs/touching

self," if he wanted his property. (*Id.* at 17-18.) Plaintiff alleges that he initially refused and went to CUS Buttice, CPM Sundberg, and CUS Pease for help, yet they told him to perform the requested sexual acts. (*Id.* at 18.) Therefore, Plaintiff alleges, the next time Officer Gonzalez approached him, he complied and Officer Gonzalez raped him. (*Id.* at 18-19.) At his deposition, however, Plaintiff testified only two instances of sexual harassment occurred and Officer Gonzalez never touched him but only coerced him into touching himself. (*See* Jackson Depo. at 75-80.)

Plaintiff also alleges he filed numerous Prison Rape Elimination Act ("PREA") complaints against Officer Gonzalez, which were all denied. (Am. Compl. at 19.) He alleges CPM Sundberg, CUS Buttice, CUS Pease, and Officer Dunleavy retaliated against him for filing the PREA complaints. (*Id.*) Specifically, he claims CPM Sundberg told him to stop writing PREA complaints and moved him from IMU South to IMU North on December 29, 2016. (*Id.*; *see also* Dkt. # 169-4 at 53.) He claims CUS Pease and Officer Dunleavy "harassed" him and destroyed his property in retaliation for filing grievances and PREA complaints. (Am. Compl. at 19-20; Dkt. # 169-3 at 101-04 (Grievance # 17624968 filed 1/11/2017).) He also alleges that on December 23, 2016, CUS Pease told him to "shut the fuck up and stop writing grievances" and then denied him lunch. (Am. Compl. at 20; *see also* Dkt. # 169-3 at 96-99 (Grievance # 17625918 filed 1/25/2017).) Plaintiff claims CUS Buttice retaliated by damaging his property and making false accusations against him, which resulted in him being "denied due process, infracted, and sexually assaulted/raped." (Am. Compl. at 20.)

Officer Gonzalez, CUS Buttice, and CPM Sundberg deny Plaintiff's allegations of sexual harassment and retaliation. (Gonzalez Decl. (Dkt. # 144) at ¶ 5; Buttice Decl. (Dkt. # 140) at

1    ¶¶ 6-7; Sundberg Decl. (Dkt. # 151) at ¶¶ 4-6.) Defendants have not submitted declarations from

2    CUS Pease or Officer Dunleavy.

3        **D.    Alleged Retaliation and Discrimination**

4        Plaintiff brings claims related to alleged retaliation and discrimination against Donna

5    Hubbs ("Ms. Hubbs"), CUS Buttice, CPM Sundberg, Mr. Thrasher, and Kara Hubbs ("Ms.

6    Hubbs's daughter").

7            *1.    Ms. Hubbs*

8        In 2017 and 2018, Ms. Hubbs was a certified facilitator of a DOC rehabilitative program

9    called Alternatives to Aggression ("A2A"). (Hubbs Decl. (Dkt. # 146) at ¶ 3.) Plaintiff was in the

10   program from November 2017 through January 2018. (Am. Compl. at 22.) Plaintiff was a

11   difficult participant at times, and Ms. Hubbs issued several infractions against him in December

12   2017 because of inappropriate and disruptive behavior in the classroom. (Hubbs Decl. at ¶ 4.)

13   Plaintiff alleges Ms. Hubbs made racist comments, used racist examples, used racial slurs, and

14   provided only Christian materials in class. (Am. Compl. at 22, 30.)

15       Plaintiff also alleges that Ms. Hubbs was racially motivated when she infracted him and

16   that she retaliated against him for his good faith participation in a group complaint. (Am. Compl.

17   at 22, 29.) These claims appear to be based on an infraction Ms. Hubbs issued on December 28,

18   2017, related to events that occurred on December 21, 2017. (*See* Dkt. # 169-4 at 95.) Ms.

19   Hubbs's infraction report narrative states that the following occurred: On December 21, 2017, a

20   day when Quality Assurance ("QA") staff were observing her A2A class, Plaintiff began

21   speaking to other inmates in the classroom and asking whether they were still going to join him

22   in telling the QA staff that Ms. Hubbs was racist. (*Id.*) Plaintiff then informed one of the QA

23   staff that he had a complaint about Ms. Hubbs. (*Id.*) The QA staff informed Plaintiff that he

needed to take his complaint to Ms. Hubbs's supervisor. (*Id.*) Plaintiff continued his attempts to raise his complaints and recruit other inmates to his cause despite several staff informing him that he needed to follow proper procedures to make a complaint. (*Id.*) Ms. Hubbs informed Plaintiff that if he continued to disrupt the class, he would be removed. (*Id.*) After Plaintiff continued with his comments, a corrections officer escorted him from the class. (*Id.*) As he left, he dropped a complaint he wrote on behalf of the class on the QA staff's desk. (*Id.*) The group complaint alleged, among other things, that Ms. Hubbs forced class participants to "use racist and judgmental ideas" and asked her supervisor to discuss "her certain opinions on race, place of birth & sexual orientation in class & forcing people to use them." (*Id.* at 98-99.) In the infraction report, Ms. Hubbs stated:

> Offender Jackson from when he was seated in the classroom until he was escorted out of the room was persistent in his attempts to get other inmates as a group to disrupt class by calling me racist and making a group complaint to the Quality Assurance staff . . . . He made these statement in class in a manner to intimidate me by making emotionally charge[d] statements of racism and my inability to do my job consistently. The letter he left with staff makes several untrue and inflammatory statements and calls for corrective action towards me and is signed Cordially A2A classes of 2017 & 2018.

(*Id.* at 95.)

Following a disciplinary hearing on January 8, 2018, Plaintiff was found guilty of "[c]ausing an innocent person to be penalized or proceeded against by providing false information," "[e]ngaging in or inciting a group demonstration," and "[e]ngaging in disruptive behavior." (Dkt. # 169-4 at 104.) He was sanctioned with 15 days in segregation and 30 days loss of telephone privileges. (*Id.*) These findings were upheld on appeal (*Id.*)

Plaintiff further alleges that after Ms. Hubbs reviewed the group complaint, she started calling him a "nigger" and a "devil worshiping nigger" and told him, "Since you worship Satan, I'll make your life hell." (Am. Compl. at 22-23.) He also alleges that she "used racial

1  motivation" to write numerous negative log entries against him and that inmates who were not

2  African American and Satanic did not receive the same treatment. (*Id.*; *see also* Dkt. # 169-4 at

3  106 (Offender Management Network Information ("OMNI") log entries from 1/2/2018 and

4  1/8/2018).)

5      Plaintiff further claims that on January 19, 2018, in retaliation for writing the group

6  complaint, Ms. Hubbs directed two corrections officers to require him to remove his dreadlocks

7  before he could leave his cell.[5] (Am. Compl. at 23-24, 26.) On or about January 23, 2018,

8  Plaintiff sawed off his dreadlocks so he would be able to leave his cell. (*See id.* at 25-28.) He

9  alleges that once Ms. Hubbs heard this, she came to his cell front and told him that she was going

10  to start poisoning his food because he was a "devil worshiping nigger." (*Id.* at 28.) Plaintiff

11  alleges that as a result of this threat, he stopped eating from January 24 to January 28, 2018. (*Id.*)

12  On January 29, 2018, Ms. Hubbs removed Plaintiff from the A2A program, and he resumed

13  eating because he would not have to see her again. (*Id.* at 29-30.)

14      Ms. Hubbs denies Plaintiff's allegations against her. (Hubbs Decl. at ¶ 5.)

15          *2.    Ms. Hubbs, CUS Buttice, CPM Sundberg, Mr. Thrasher*

16      The WSP does not limit the length of prisoners' hair, and IMU inmates are generally

17  allowed to have dreadlocks but not braids in their hair. (Dkt. # 169-4 at 32, 44 (Buttice Disc.

18  Resp.).) In late 2017 and early 2018, WSP IMU staff initiated a program requiring IMU staff to

19  more thoroughly search IMU inmates for contraband, including contraband that may be in their

20  hair. (Buttice Decl. at ¶ 4.) Inmates with braids in their hair were required to undo the braids and

21  shake out their hair in response to staff requests before being escorted out of their cells. (*Id.*; Am.

22

23

---

[5] This claim is discussed in more detail in the next section.

1    Compl. at 23.) There is no indication in the record that this policy was intended to apply to

2    inmates with dreadlocks.

3        On January 19, 2018, officers who were assigned to escort Plaintiff to programming

4    determined that he had braids in his hair that he needed to undo and shake out before they could

5    escort him out of his cell. (Buttice Decl. at ¶ 4.) Plaintiff, however, claimed he had dreadlocks

6    that he could not undo. (*Id.*; Am. Compl. 23-24.) Plaintiff alleges that he told the officers his

7    dreadlocks were religious and showed them he could not undo his hair. (Am. Compl. at 24.)

8    According to Plaintiff, the officers observed he had dreadlocks that he could not remove. (*Id.* at

9    33.) But because Plaintiff did not take down his hair, the officers would not escort him out of his

10    cell. (Buttice Decl. at ¶ 4.) Plaintiff alleges he was told that if he did not take his hair out or cut it

11    off, he would remain in his cell and would be denied programming, yard, shower, food, and

12    access to a phone and mental health therapy.[6] (Am. Compl. at 24.)

13        Plaintiff alleges that he told CUS Buttice and CPM Sundberg that his hair had been in

14    dreadlocks for years, would not come out, and was religious; he alleges he also told them that he

15    received no notice of the rule-change and therefore had no fair opportunity to cut his hair. (Am.

16    Compl. at 24-25.) Plaintiff claims CUS Buttice and CPM Sundberg ignored his complaints. (*Id.*

17    at 25.) CUS Buttice attests he did not know Plaintiff's hair style was related to his religion and

18    had observed braids in his hair, not dreadlocks. (Buttice Decl. at ¶ 5.)

19        Plaintiff claims that he went from January 19 to January 22, 2018 without food, yard,

20    shower, or mental health treatment. (Am. Compl. at 25.) CUS Buttice and CPM Sundberg attest

21    that IMU inmates receive meals in their cells, and Plaintiff's ineligibility to leave his cell did not

22    affect his access to food. (Buttice Decl. at ¶ 4; Sundberg Decl. at ¶ 7.)

23

---

[6] Plaintiff does not identify who told him this.

REPORT AND RECOMMENDATION - 17

On January 22 or 23, 2018, Plaintiff cut his hair by sawing it against the cuff port on his cell door, which caused "severe rub burns" and a "bloody scalp."[7] (Am. Compl. at 25-26; *see* Buttice Decl. at ¶ 5.) IMU staff were then able to conduct the required search and he was allowed out of his cell. (Buttice Decl. at ¶ 5; Sundberg Decl. at ¶ 7.)

Plaintiff alleges that Ms. Hubbs, CUS Buttice, CPM Sundberg, and Mr. Thrasher ordered IMU staff to keep him in his cell until he took out his dreadlocks.[8] (Am. Compl. at 23-24.) He also claims that he was the only prisoner in the WSP IMU who was denied programming in January 2018 due to his dreadlocks and that other inmates were not told to cut or take out their hair. (*Id.* at 27-28.)

Based on the foregoing, Plaintiff alleges Ms. Hubbs, CUS Buttice, CPM Sundberg, and Mr. Thrasher violated his rights under RLUIPA, the Free Exercise Clause, the First Amendment's prohibition on retaliation, the Equal Protection Clause, and the Cruel and Unusual Punishment Clause. (Am. Compl. at 32.)

### 3.    *Ms. Hubbs's Daughter*

In February 2018, Plaintiff filed a lawsuit against Ms. Hubbs in the U.S. District Court for the Eastern District of Washington. (Am. Compl. at 30-31 (citing *Kennedy v. Patzkowski,* No. 4:18-cv-5028-SMJ (E.D. Wash. Feb. 16, 2018).) Plaintiff alleges that on April 1, 2018, Ms. Hubbs's daughter told Plaintiff that she would pay to have him assaulted if he continued to pursue the lawsuit against her mother. (*Id.*) Ms. Hubbs attests she did not know about the lawsuit

---

[7] Plaintiff alleges the barber was not scheduled to come to his unit until February 19, 2018. (Am. Compl. at 26.)

[8] Plaintiff's claims against Mr. Thrasher are based on the fact that Mr. Thrasher responded to Plaintiff's Level III grievance on the issue. (*See* Resp. at 15; Dkt. # 169-5 at 12.)

until late 2018 and therefore could not have told her daughter about the lawsuit prior to April 1, 2018. (Hubbs Decl. at ¶ 6.)

### E.    Interference with the Grievance Process

Plaintiff alleges Defendants interfered with his use of the grievance process in violation of his due process rights. (Am. Compl. at 33-35.) He claims he was denied food but could not file a grievance on the issue because all inmates were being denied food at the time and he would have been infracted for participating in a group demonstration. (*Id.* at 34.) He alleges a May 2018 grievance was denied because DOC staff determined it was similar to a January 2017 grievance he filed addressing a completely different event. (*Id.*) He alleges the WSP grievance coordinator tampered with Chaplain Ivey's response to a grievance he filed. (*Id.* at 35.) He also alleges he was disallowed from participating in two grievances because unidentified Defendants lied and stated that he refused to participate. (*Id.*)

## III.    LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

1   presenting evidence that negates an essential element of the nonmoving party's case, or by

2   establishing that the nonmovant lacks the quantum evidence needed to satisfy its burden at trial.

3   *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

4          If the moving party meets its initial responsibility, the burden then shifts to the

5   nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus.*

6   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Genuine disputes are those for which

7   the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

8   *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit

9   under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute.

10  *Id.* at 252. In addition, it is the nonmoving party's responsibility to "identify with reasonable

11  particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275,

12  1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of

13  a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3)

14  ("The court need consider only the cited materials, but it may consider other materials in the

15  record.").

16         In ruling on a motion for summary judgment, the Court must draw all reasonable

17  inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The

18  Court also may not weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at

19  248; *see also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court

20  cannot disregard evidence at the summary judgment stage solely based on its self-serving nature,

21  even if it is uncorroborated, unless it "states only conclusions and not facts that would be

22  admissible in evidence" (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5,

23  1061 (9th Cir. 2002) (district court properly disregarded the declaration that included facts

1    beyond the declarant's personal knowledge and did not indicate how she knew the facts to be

2    true); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A

3    conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

4    insufficient to create a genuine issue of material fact."))).

5        A verified complaint, like Plaintiff's, "may be treated as an affidavit to oppose summary

6    judgment to the extent it is based on personal knowledge and sets forth specific facts admissible

7    in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal quotations

8    omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203

9    F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). But allegations that are based merely on

10   Plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture

11   and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir.

12   2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

13       **B.      Section 1983 Claims**

14       To sustain a § 1983 civil rights claim, Plaintiff must show: (1) he suffered a violation of

15   rights protected by the Constitution or created by federal statute; and (2) the violation was

16   proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48

17   (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong,

18   Plaintiff must allege facts showing how individually named defendants caused or personally

19   participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

20   (9th Cir. 1981).

21       **C.      Qualified Immunity**

22       The doctrine of qualified immunity protects government officials from civil liability

23   under § 1983 if "their conduct does not violate clearly established statutory or constitutional

1  rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013)

2  (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity

3  gives government officials breathing room to make reasonable but mistaken judgments about

4  open legal questions" and "protects 'all but the plainly incompetent or those who knowingly

5  violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475

6  U.S. 335, 341 (1986)). "To determine whether an officer is entitled to qualified immunity, a

7  court must evaluate two independent prongs: (1) whether the officer's conduct violated a

8  constitutional right, and (2) whether that right was clearly established at the time of the incident."

9  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citing *Pearson*,

10  555 U.S. at 232). Either prong may be considered first. *Pearson*, 555 U.S. at 236. When

11  addressing qualified immunity on summary judgment, the Court "may not resolve genuine

12  disputes of fact in favor of the [moving] party" and must view the evidence in the light most

13  favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

## IV.   DISCUSSION

### A.   Evidentiary Issues

16  Before addressing the merits of Defendants' motion for summary judgment, the Court

17  must resolve three evidentiary issues: (1) Defendants' motion to strike material Plaintiff

18  submitted in opposition to their motion for summary judgment; (2) Plaintiff's claim that he was

19  not competent to testify during his deposition; and (3) Plaintiff's claim that Defendants destroyed

20  evidence relevant to this action. As discussed below, the Court grants in part and denies in part

21  Defendants' motion to strike and denies Plaintiff's challenges to his deposition testimony and the

22  alleged spoliation of evidence.

23

1

                   1.       *Defendants' Motion to Strike*

2

        In opposing Defendants' motion for summary judgment, Plaintiff submitted 108

3

attachments totaling over 600 pages of evidence. (*See generally* Resp.; Dkt. ## 169-1–169-5.)

4

Defendants concede that Plaintiff properly submitted Attachments 8, 11-22, 29-30, 66-69, 96, 99,

5

105, and any other attachments he submitted in support of his motion for summary judgment.[9]

6

(Reply at 2.) They argue that the remainder of the evidence should be stricken. (*Id.* at 2-3.)

7

        First, Defendants move to strike the unsworn inmate declarations in Attachments 49-53,

8

55, 84-85, 87, 89, and 91-92. (Reply at 2-3.) Plaintiff responds with his own declaration, sworn

9

under oath, that "[o]n January 30, 2019, I had 2,013 pages of evidence destroyed by the

10

Department of Corrections for this case," including "109 typed witness statements sworn under

11

oath by prisoners . . . ." (Jackson Decl. (Dkt. # 171) at 1-2.) Plaintiff states that once his original

12

witness statements were destroyed, he was forced to submit what he had. (Surreply at 1.) The

13

allegedly destroyed witness statements, however, are not at issue in the motion to strike; rather,

14

the question is whether the evidence Plaintiff did submit is admissible. Unsworn declarations not

15

signed under penalty of perjury do not constitute admissible evidence properly considered in

16

ruling on a motion for summary judgment. *See* 28 U.S.C. § 1746 (unsworn declarations must

17

state that the matters asserted by the declarant are "true under penalty of perjury"); *see also*

18

*United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003); *Chao v. Westside Drywall, Inc.*, 709

19

F.Supp.2d 1037, 1052 (D. Or. 2010). The witness statements Defendants identify were not sworn

20

under penalty of perjury, therefore the Court grants Defendants' motion to strike Attachments

21

49-53, 55, 84-85, 87, 89, and 91-92.

22

23

---

[9] Defendants note that Plaintiff has made notations on many of these documents and asks the Court to either strike or disregard any of Plaintiff's additions to these documents. (Reply at 2 n.1.) The Court will not consider handwritten additions to any documents.

REPORT AND RECOMMENDATION - 23

1        Second, Defendants argue that some of Plaintiff's attachments are entirely irrelevant,

2   specifically identifying Attachments 37 and 65, which are whistleblower complaints that are

3   unrelated to Plaintiff, Defendants, and Plaintiff's claims in this case. (Reply at 3.) Although

4   Plaintiff contends these attachments are relevant, the Court has reviewed them and concurs with

5   Defendants. Accordingly, the Court grants Defendants' motion to strike Attachments 37 and 65.

6        Third, Defendants argue generally that the remaining attachments subject to the motion to

7   strike should be stricken as unauthenticated hearsay. (Reply at 2.) Defendants rely primarily on

8   the fact that Plaintiff did not authenticate the documents through personal knowledge in an

9   attached affidavit. (*See id.*) "In a summary judgment motion, documents authenticated through

10  personal knowledge must be 'attached to an affidavit that meets the requirements of [Fed. R. Civ.

11  P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into

12  evidence.'" *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002) (internal

13  footnotes and quoted source omitted). It is true Plaintiff did not attempt to authenticate his

14  attachments through personal knowledge. However, personal knowledge is not the only way to

15  authenticate evidence. Authentication simply requires "evidence sufficient to support a finding

16  that the matter in question is what its proponent claims." *Id.* at 773 (quoting Fed. R. Evid.

17  901(a)). Documents may be authenticated as provided in Federal Rules of Evidence 901(b)

18  (providing ten methods of authentication) or 902 (identifying self-authenticating documents that

19  "require no extrinsic evidence of authenticity in order to be admitted"). *See id.* at 778 n.24.

20       Many of the documents included in Plaintiff's attachments comply with Rule 901(b)(4),

21  which provides that authenticity may be satisfied by the "[a]ppearance, contents, substance,

22  internal patterns, or other distinctive characteristics of the item, taken together with all the

23  circumstances." For example, Plaintiff submits documents that appear to have been produced by

Defendants during discovery, as evidenced by the Bates stamp, and Defendants do not assert any reason to doubt these documents' authenticity. *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996) (documents produced by a party in discovery were deemed authentic when offered by the party-opponent); *Welenco, Inc. v. Corbell*, 126 F.Supp.3d 1154, 1163-64 (E.D. Cal. 2015) (finding that documents produced in response to discovery requests were admissible given the lack of any argument that the documents were inauthentic); *Del Campo v. Am. Corrective Counseling Serv., Inc.*, 718 F.Supp.2d 1116, 1123 n.10 (N.D. Cal. 2010) ("Since Defendants do not specify any reason to doubt the authenticity of documents that they themselves produced in discovery, the Court finds the documents properly authenticated under Fed. R. Evid. 901."). Plaintiff also submits other DOC documents, including kites, grievances, responses to grievances, responses to mail rejections, and infractions that were not produced during discovery but appear authentic based on their appearance, contents, and substance.

Given that Defendants make only a general objection that fails to take into account other methods of authentication under Rule 901(b)(4), the Court declines to strike any additional material. If Defendants believe the Court has erroneously relied on any of Plaintiff's attachments in this Report and Recommendation, they may raise specific issues in an objection.[10]

Defendants' motion to strike is GRANTED in part and DENIED in part as set forth above.

### 2. *Plaintiff's Competency During His Deposition*

Counsel for Defendants took Plaintiff's deposition on October 2, 2019, and Defendants have submitted the deposition transcript in support of their motion for summary judgment. (First

---

[10] To the extent material evidence has not been properly authenticated, the Court has the discretion to give Plaintiff an opportunity to properly support his asserted facts. *See* Fed. R. Civ. P. 56(e)(1).

REPORT AND RECOMMENDATION - 25

Carr Decl. (Dkt. # 141) at ¶ 2; Jackson Depo.) During the deposition, Plaintiff asked to terminate pursuant to Federal Rule of Civil Procedure 30(d)(3) until he could receive an order from a judge regarding counsel's failure to sign a new notice of deposition. (*See* Jackson Depo. at 12-21.) The parties went off the record, and the undersigned conducted a telephonic hearing at which she ordered Plaintiff to provide answers to the deposition questions. (*See id.* at 21; Dkt. # 127 (10/2/2019 Minute Entry).) When the parties returned to the deposition, counsel asked whether Plaintiff was on any medications that would hinder his ability to participate in the deposition, and the following exchange occurred:

> A. I'm supposed to be on medications but I refused my medications.
>
> Q. So the answer would be no, you're not?
>
> A. The answer would be, yes. But it's my medications that would help me proceed rather than the other things that . . . .
>
> Q. Okay. Do you have any problems understanding my questions today?
>
> A. Not at this time.
>
> Q. Okay.

(Jackson Depo. at 21-22.) Counsel then proceeded to ask Plaintiff about his education and work history, his committed name (Kyntrel Jackson), the name he uses (Sinister Daevayasnaham God), the relationship between the name he uses and his religion, a civil rights complaint he filed in 2016, some of his mental health struggles, and some of his family members. (*Id.* at 22-31.) The following exchange then occurred:

> Q. So I kind of touched on this before about your religion and trying to figure out how your name related to your religion. What is your religion?
>
> A. Satanic.
>
> Q. Do you want to take a break for a bit?

1  A. No.

2  Q. What does that mean? What does that mean to you?

3    MR. CARR: Why don't we go off the record.

4      (Brief break.)

5 (*Id.* at 31.) After the break, the deposition resumed without further apparent issues.

6  On January 17, 2020, Plaintiff filed a declaration under oath in which he claims that

7 Defendants knew he had mental health triggers, purposely caused him to have a "mental health

8 breakdown" during the deposition, and that he does not remember anything after the brief break

9 noted above. (Jackson Decl. at 4.) He attaches to his declaration a mental health kite he wrote at

10 9:10 p.m. on October 2, 2019, stating:

> I suffer from quite a few mental health issues and today I was at a deposition.
> Although I remember going in around 9:35 a.m. I do not recall eating lunch, dinner,
> or being put back in my house. I know that one of my mental health triggers
> happened at this deposition but can't recall much else after except seeing the clock
> stating 8:50 p.m. I ask if you can please tell me if there's any record of when I was
> put back in my house.

(Jackson Decl. at 38.) On October 3, 2019, a mental health staff member responded, "MH does

not have this information. Would appreciate it if you attend your next scheduled appointment to

discuss your mental health issues." (*Id.*) Plaintiff also attaches to his declaration a letter he wrote

to counsel for Defendants on October 3, 2019, stating that he had a mental health break down

during the deposition after discussing certain family members, does not remember what he said

after that time, and could not swear under oath that his responses were true. (*Id.* at 40.) He asked

counsel to provide him with a copy of the transcript so he could provide "proper responses with a

stable mentality." (*Id.*) Plaintiff attests that counsel never responded to his letter. (*Id.* at 4.)

  The Federal Rules of Civil Procedure allow Plaintiff to challenge the competency of his

deposition testimony after the fact. *See* Fed. R. Civ. P. 32(d)(3)(A) ("An objection to a

1   deponent's competence—or to the competence, relevance, or materiality of testimony—is not

2   waived by a failure to make the objection before or during the deposition, unless the ground for it

3   might have been corrected at that time."). The Federal Rules of Evidence establish a general

4   presumption in favor of finding witnesses competent to testify. *See* Fed. R. Evid. 601 ("Every

5   person is competent to be a witness except as otherwise provided in these rules."). Whether a

6   witness is competent to testify depends on the individual's ability to observe, to remember, to

7   communicate, and to understand that the oath imposes a duty to tell the truth. *See Tate v. Bd. of*

8   *Educ. Of the City Sch. Dist. Of Peekskill*, 346 F.Supp.2d 536, 537 (S.D.N.Y. 2004).

9         The Court is not persuaded by Plaintiff's argument that he was not competent to testify

10  during his deposition. Although he attests that he cannot remember much of the deposition itself,

11  he has had an opportunity to review the disposition transcript, which Defendants filed with their

12  motion for summary judgment, and has not identified any portions of his testimony that are

13  inaccurate. Furthermore, there is no indication in the transcript that Plaintiff was having any

14  difficulty understanding and responding to questions. Thus, Plaintiff's motion to exclude his

15  deposition testimony is DENIED.

16               *3.    Spoliation of Evidence*

17         Plaintiff attests that on January 30, 2019, "I had 2,013 pages of evidence destroyed by the

18  Department of Corrections for this case." (Jackson Decl. at 1.) The Court construes his complaint

19  as a request for sanctions based on spoliation. District courts possess inherent authority to

20  impose sanctions against a party that prejudices its opponent through the spoliation of relevant

21  evidence. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Spoliation is the

22  "destruction or significant alteration of evidence, or the failure to preserve property for another's

23  use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d

638, 649 (9th Cir. 2009). A party seeking sanctions for spoliation first bears the burden of establishing that the opposing party destroyed relevant evidence. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015). The party alleging spoliation also must prove:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Apple Inc. v. Samsung Elecs. Co.*, 888 F.Supp.2d 976, 989 (N.D. Cal. 2012) (collecting cases). "[A] finding of 'willfulness, fault, or bad faith,'" satisfies the culpability component. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quoted source omitted). "A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'" *Id.* (quoted source omitted).

"There is scant Ninth Circuit authority squarely considering whether and under what circumstances spoliation of evidence may be imputed to a defendant who did not participate in the spoliation." *Edifects, Inc. v. Welltok, Inc.*, No. 18-1086, 2019 WL 5862771, at *4 (W.D. Wash. Nov. 8, 2019) (citing *Pettit v. Smith*, 45 F.Supp.3d 1099, 1110 (D. Ariz. 2014) (discussing authorities)). "The current trend among district courts appears to be to impute liability for an agent's spoliation to the principal 'based on traditional notions of agency law, in which a defendant principal exercises control and authority over its third-party agent who possess the spoliated evidence.'" *Id.* (quoted source omitted, collecting cases).

Plaintiff provides little information regarding the alleged destruction of his legal papers. He claims that the DOC destroyed his property but does not specify which DOC employees were involved in this decision. Without this information, the Court cannot determine that any

1   Defendant was directly involved or exercised control or authority over the DOC employees who

2   were directly involved. The Court also cannot determine whether the individual who destroyed

3   the property had a "culpable state of mind." Accordingly, Plaintiff's motion based on spoliation

4   is DENIED.

5        **B.        Exhaustion**

6        Defendants argue Plaintiff failed to exhaust a number of his claims. Under the Prison

7   Litigation Reform Act ("PLRA"), a prisoner must exhaust "available" administrative remedies

8   before filing suit. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Albino v. Baca*, 747 F.3d 1162, 1165

9   (9th Cir. 2014) (en banc); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to

10  prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

11  confined in any jail, prison, or other correctional facility until such administrative remedies as

12  are available are exhausted."). The purpose is two-fold: (1) to give agencies opportunities to

13  self-correct and to discourage disregard of their own procedures; and (2) to promote efficiency

14  because agency proceedings typically reach quicker, more economical resolutions than court

15  proceedings and by producing a useful record for subsequent judicial consideration. *Sapp v.*

16  *Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010) (citing *Woodford*, 548 U.S. at 89).

17       The exhaustion requirement "applies to all inmate suits about prison life, whether they

18  involve general circumstances or particular episodes, and whether they allege excessive force or

19  some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Even when the prisoner seeks

20  relief not available in grievance proceedings, notably money damages, exhaustion is still a

21  prerequisite to suit. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Exhaustion must be proper,

22  meaning that the prisoner must complete the administrative review process in accordance with

23  the applicable rules. *Woodford*, 548 U.S. at 92-95.

1    Defendants bear the initial burden of showing that there was an available administrative

2 remedy and that Plaintiff did not exhaust that remedy. *Albino*, 747 F.3d at 1169, 1172. Once that

3 showing is made, the burden shifts to Plaintiff, who must either demonstrate that he has, in fact,

4 exhausted administrative remedies or that he has "come forward with evidence showing that

5 there is something in his particular case that made the existing and generally available

6 administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172; *see also Ross*

7 *v. Blake*, 136 S.Ct. 1850, 1859-60 (2016) (setting forth examples of when administrative

8 remedies would be unavailable). The ultimate burden, however, rests with Defendants. *Albino*,

9 747 F.3d at 1172.

10    Summary judgment is appropriate if the undisputed evidence, viewed in the light most

11 favorable to Plaintiff, shows a failure to exhaust. *Albino*, 747 F.3d at 1166, 1168; Fed. R. Civ. P.

12 56(a). If administrative remedies have not been exhausted at the time an action is brought, the

13 action must be dismissed without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir.

14 2002) (per curiam); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled*

15 *on other grounds by Albino*, 747 F.3d at 1162 ("If the district court concludes that the prisoner

16 has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without

17 prejudice.").

18    *1.    Available Administrative Remedies*

19    Defendants bear the burden of showing an available administrative remedy. The

20 grievance program at the WSP is managed in accordance with the DOC's grievance policy and

21 the Offender Grievance Program Manual. (Frederick Decl. (Dkt. # 143) at ¶ 3.) Inmates receive

22 an orientation to the grievance procedure upon their arrival at the facility and are advised that

23 both the policy and manual are maintained in the prison library and available for review. (*Id.*)

1    Plaintiff is a frequent user of the DOC grievance system and filed over 125 grievances between

2    2014 and 2019. (*Id.* at ¶ 7.)

3          Under the program, inmates may file grievances on a wide range of issues relating to

4    their incarceration, including: (1) DOC institution policies, rules, and procedures; (2) the

5    application of such policies, rules, and procedures; (3) the actions of staff and volunteers; and (4)

6    retaliation by staff for filing grievances. (Frederick Decl. at ¶ 4.) Inmates may not file grievances

7    if there is an appeal process of the issue they are raising, such as the disciplinary process, mail

8    rejections, and classification decisions, all of which have their own appeal processes. (*Id.*)

9          All grievance information is stored and maintained in the DOC's OMNI database.

10   (Frederick Decl. at ¶ 6.) At the time the grievance information is entered into the database, it is

11   categorized by area or nature of complaint. (*Id.*)

12         The grievance procedure consists of four levels of review—Level 0 through Level III.

13   (Frederick Decl. at ¶ 5.) Level 0 is an informal level in which the inmate submits a written

14   complaint and the local grievance coordinator determines whether to resolve the issue informally

15   and/or whether the grievance should be processed as a formal grievance. (*Id.*) Level I is for

16   routine grievances about policies, procedures, or other inmates. (*Id.*) An inmate may appeal a

17   Level I grievance to Level II. (*Id.*) Grievances about staff conduct are initiated as Level II

18   grievances. (*Id.*) Level II grievances/appeals are decided by the facility Superintendent or his

19   designee. (*Id.*) An inmate may appeal a Level II grievance to Level III, which is decided by DOC

20   Headquarters staff. (*Id.*)

21         Grievances alleging sexual misconduct or retaliation for reporting sexual misconduct are

22   handled differently. (Frederick Decl. at ¶ 9.) Although an inmate may file a grievance concerning

23   sexual misconduct, the grievance process will cease, and the grievance will be processed and

1   investigated by DOC's PREA unit as a complaint made under PREA.[11] (*Id.*) If the PREA

2   coordinator determines that the alleged conduct does not meet the definition of sexual

3   misconduct, the inmate may refile the grievance. PREA PREVENTION AND REPORTING (DOC

4   Policy 490.800) at 14-15, *available at* https://www.doc.wa.gov/corrections/prea/default.htm (last

5   visited June 23, 2020). Inmates may also raise PREA allegations through: (1) the confidential

6   PREA hotline; (2) verbally to any staff; or (3) in writing through the following processes:

7   (i) offender kites; (ii) written notes or letters to staff; (iii) legal mail addressed to the State

8   Attorney General, the Office of the Governor, law enforcement, and/or the PREA Coordinator;

9   or (iv) a written report to an outside agency made using DOC 21-379 Report of PREA

10  Allegation. *Id.* PREA complaints are exhausted once the DOC's PREA investigation is complete.

11  (*See* Scamahorn Decl. (Dkt. # 149) at ¶ 3.)

12          This evidence establishes that there was a generally available administrative remedy.

13                    *2.      Defendants' Initial Burden*

14          Defendants next must show that Plaintiff did not exhaust the available administrative

15  remedies. Defendants have submitted the declaration of Ronald Frederick, the Grievance

16  Program Manager in the Office of Correctional Operations at the DOC Headquarters, who attests

17  that he thoroughly searched and reviewed DOC's official grievance records for Plaintiff and

18  found no records indicating that Plaintiff filed any grievance claiming that: (1) Officer Gonzalez,

19  CPM Sundberg, CUS Buttice, CUS Pease, and/or Officer Dunleavy raped/sexually assaulted him

20  in 2016; (2) any Defendant denied him food in January 2018; (3) Ms. Hubbs called him a

21  "nigger" or "devil worshiping nigger" in late 2017 or early 2018; (4) Ms. Hubbs told him in late

22

---

23  [11] PREA does not excuse the requirement of administrative exhaustion. *Porter v. Howard*, 531 Fed.
App'x 792, 793 (9th Cir. 2013); *Myers v. Grubb*, No. 12-29, 2013 WL 352194, at *1 (D. Mont. Jan. 29,
2013).

2017 or early 2018 that she was going to poison his food; (5) Ms. Hubbs used only Christian

materials and made racial slurs in a class he was taking in late 2017 and early 2018; and (6) Ms.

Hubbs's daughter threatened to have him assaulted for filing a lawsuit against Ms. Hubbs.

(Frederick Decl. at ¶¶ 8-10, 12.) All these issues are grievable under DOC's grievance system as

alleged instances of employee misconduct. (*Id.* at ¶ 9.)

Defendants also have submitted the declaration of Lori Scamahorn, the PREA Manager

at the WSP, who attests that Plaintiff did not file a PREA complaint over the alleged rapes/sexual

assaults by Officer Gonzalez, CPM Sundberg, CUS Buttice, CUS Pease, and Officer Dunleavy

in 2016. (Scamahorn Decl. at ¶ 3.) According to Ms. Scamahorn, PREA investigations were

opened into these Defendants in late 2018 after another Defendant in this case, Carla Schettler,

brought the allegations to DOC's attention after Plaintiff's complaint was served. (*Id.*) These

investigations, however, have not been completed.[12] (*Id.*)

The Court is persuaded that Defendants' evidence satisfies their initial burden of

establishing Plaintiff failed to exhaust his administrative remedies as to the specific claims

identified by Mr. Frederick. Mr. Frederick's testimony, however, does not address all the claims

Plaintiff raised against Ms. Hubbs. In addition to those addressed by Mr. Frederick, Plaintiff

alleges that Ms. Hubbs made racist comments and used racist examples in the A2A class,

infracted him because of his race, and retaliated against him for bringing forth the group

complaint. As Mr. Frederick's declaration does not address these claims, Defendants have not

met their initial burden of showing a failure to exhaust these claims. Defendants do not brief the

---

[12] Regardless of whether the investigations are now completed, they were commenced after this lawsuit
was filed and therefore do not exhaust Plaintiff's sexual harassment claims. *See McKinney*, 311 F.3d at
1199 (action must be dismissed without prejudice if administrative remedies have not been exhausted at
the time the action is brought).

REPORT AND RECOMMENDATION - 34

1    merits of these racial discrimination and retaliation claims in their motion for summary

2    judgment, therefore the Court recommends that summary judgment on these claims be denied.

3                    *3.    Plaintiff's Burden*

4            The burden now shifts to Plaintiff, who must show that he in fact exhausted his

5    administrative remedies or that "there is something particular in [his] case that made the existing

6    and generally available remedies effectively unavailable to [him] by 'showing that the local

7    remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'"

8    *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).

9    The Supreme Court has held there are three circumstances in which an administrative remedy is

10   not capable of potential relief. *Ross*, 136 S.Ct. at 1858-60. First, "an administrative procedure is

11   unavailable when (despite what regulations or guidance materials may promise) it operates as a

12   simple dead end—with officers unable or consistently unwilling to provide any relief to

13   aggrieved inmates." *Id.* at 1858; *see also Nunez v. Duncan*, 591 F.3d 1217, 1224-25 (9th Cir.

14   2010) (acts by prison officials that prevent the exhaustion of administrative remedies may make

15   administrative remedies effectively unavailable). "Next, an administrative scheme might be so

16   opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S.Ct. at 1859. "And

17   finally, the same is true when prison administrators thwart inmates from taking advantage of a

18   grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

19                    i.    Rape/Sexual Assault Claims

20           Plaintiff argues he exhausted his rape/sexual assault claims, citing Attachments 38-44 to

21   his response.[13] (Resp. at 8.) As an initial matter, none of these attachments raise any claims

22   against CPM Sundberg, CUS Buttice, CUS Pease, or Officer Dunleavy. Accordingly, Plaintiff

23

---

[13] Attachment 41 includes a coversheet but no documents (dkt. # 169-3 at 17) and thus does not support
Plaintiff's exhaustion argument.

REPORT AND RECOMMENDATION - 35

fails meet his burden with respect to these Defendants and the Court recommends that the claims of rape/sexual harassment against them be dismissed.

Attachment 38 is Plaintiff's PREA complaint that on September 29, 2016, Officer Gonzalez failed to give him all his requested property, ignored his attempts to discuss the issue, and told him, "You can suck my fucking dick," after he stated he would file a grievance against the officer. (Dkt. # 169-3 at 10-12.) The PREA unit found that this was not a valid PREA claim and no further action was taken by either the grievance coordinator or Plaintiff. (Frederick Decl. at ¶ 11.) Because Plaintiff never followed up by pursuing the traditional grievance procedure, this claim was never exhausted.[14]

Attachments 39 and 40 relate to a November 2, 2016 call Plaintiff made to the PREA hotline. (Dkt. # 169-3 at 14-16.) Plaintiff reported that Officer Gonzalez was sexually harassing multiple inmates and refusing to deliver inmate property. (*Id.* at 16.) Plaintiff did not specify the form of the alleged sexual harassment. (*Id.*) On November 4, 2016, a member of the PREA unit emailed Superintendent Holbrook a summary of Plaintiff's call, noted that several similar complaints against Officer Gonzalez had been determined to not be valid PREA claims, and asked whether a PREA investigation should be assigned. (*Id.* at 14.) There is no evidence in the

---

[14] Even if the claim was exhausted, no reasonable jury could conclude that Officer Gonzalez's alleged statement violated Plaintiff's constitutional rights. *See, e.g.*, *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) (affirming dismissal of Eighth Amendment sexual harassment claim where the officer exposed himself to prisoner in elevated, glass-enclosed control booth for no more than 30-40 seconds, noting "the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment"); *Keenan*, 83 F.3d at 1092 (disrespectful and assaultive comments by prison guard not enough to implicate Eighth Amendment); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987); *Ellingburg v. Lucas*, 518 F.2d 1196, 1197 (8th Cir. 1975) (prisoner does not have cause of action under § 1983 for being called obscene name by prison employee); *McCollum v. California*, 610 F.Supp.2d 1053, 1060 (N.D. Cal. 2009); *Grisham v. County of Los Angeles*, No. 16-8079, 2019 WL 2360897, at *11 (C.D. Cal. Apr. 26, 2019), *adopted by*, 2019 WL 2358914 (C.D. Cal. June 3, 2019) (female prisoner failed to identify "any facts raising a reasonable inference that the deprivation was sufficiently serious to support an Eighth Amendment claim," based on allegations that female guards made vulgar comments, shined flashlight up female prisoner's buttocks and vagina for two to three minutes, while laughing and making lustful comments or sexual innuendo, during visual unclothed body searches).

1    record that an investigation was opened in response to this call or that Plaintiff pursued the

2    traditional grievance procedure. Therefore, Attachments 39 and 40 do not establish that he

3    exhausted this claim.

4    　　　In some circumstances, "improper screening of an inmate's administrative grievance

5    renders administrative remedies 'effectively unavailable' such that exhaustion is not required."

6    *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010). To fall within this exception, the inmate

7    "must show that he attempted to exhaust his administrative remedies but was thwarted by

8    improper screening." *Id.* He must establish: "(1) that he actually filed a grievance or grievances

9    that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the

10   claim that he seeks to pursue in federal court; and (2) that prison officials screened his grievance

11   or grievances for reasons inconsistent with or unsupported by applicable regulations." *Id.* at

12   823-24. In this instance, there is no evidence in the record regarding why Plaintiff's complaint

13   did not result in a PREA investigation. Thus, there is no evidence that DOC officials screened his

14   complaint "for reasons inconsistent with or unsupported by applicable regulations." *Id.*

15   Accordingly, Plaintiff has not shown his administrative remedies were effectively unavailable.

16   　　　Plaintiff next cites Attachments 42 and 43, which are documents related to two PREA

17   hotline calls Plaintiff made on July 14, 2017. (Dkt. # 169-3 at 53-57.) In the calls, Plaintiff stated

18   that he "had [a] PREA related incident where I felt I was being sexually harassed and made to do

19   sexual things to the point where they moved me out [of the unit and away from the officer]." (*Id.*

20   at 53.) He also stated that he had been "made to do sexual things in order to get things." (*Id.*)

21   Based on the evidence Plaintiff submits, it appears DOC staff followed up with him and when

22   asked what the officer did to make him feel sexually harassed, he reported, "It all started over a

23   book, C/O Gonzales wouldn't issue it to me, when I questioned him he told me at cell front

'Suck my dick.' He made me strip search and take my clothes off." (*Id.* at 54.) On July 25, 2017,

Ms. Scamahorn sent Plaintiff a letter informing him that his allegation had been reviewed by the

PREA Unit, which determined that his issue did not meet the criteria for PREA, and therefore an

investigation would not be conducted. (*Id.* at 56.) On August 10, 2019, Plaintiff submitted a kite

to Ms. Scamahorn stating, "To be 100% sure can you please confirm that your [sic] telling me

that a C/O telling me to perform oral sex on him & to do sexual acts for my property is in your

opinion not PREA." (*Id.* at 57.) On August 16, 2017, Ms. Scamahorn responded that she did not

make the decision. (*Id.*)

Regardless of what the PREA Unit decided, Plaintiff's evidence does not establish that he

exhausted this PREA complaint. Because the PREA Unit declined to open an investigation, he

was required to proceed through the regular grievance process, which he failed to do.

Furthermore, the evidence is insufficient to establish improper screening. Although Plaintiff

stated in a kite that Officer Gonzalez had asked him to perform oral sex and do other sexual acts

in order to receive his property, his statements to the investigator appear to report an

unprofessional comment and a request to submit to a strip search, a regular occurrence in prison

that is not a sexual act. Based on the current record, the Court cannot conclude that his PREA

complaint was dismissed "for reasons inconsistent with or unsupported by applicable

regulations." *Sapp*, 623 F.3d at 823-24.

Finally, Plaintiff cites Attachment 44, which relates to his unsuccessful attempt to obtain

a restraining order against Officer Gonzalez from the Walla Walla District Court. (Dkt. # 169-3

at 58-61.) The documents regarding the restraining order do not establish exhaustion or that

Plaintiff's administrative remedies were unavailable. (*Id.*)

Based on the foregoing, the Court concludes, viewing the evidence in Plaintiff's favor, that Defendants have satisfied their summary judgment burden of showing a failure to exhaust Plaintiff's sexual harassment claims against Officer Gonzalez. The Court thus recommends summary judgment be granted in Defendants' favor on these claims.

### ii.   Denial of Food

Liberally construing Plaintiff's response, he appears to suggest that he exhausted his denial of food claim, citing Attachments 77, 82, and 83. (Resp. at 14.) Attachments 77 and 83 include several kites. (Dkt. # 169-3 at 23, 39-41.) Filing a kite, however, does not exhaust an inmate's remedies under the established grievance procedures. Attachment 82 is a grievance Plaintiff filed on January 19, 2018, that does not allege he was denied food. (*Id.* at 37.) Because this evidence does not demonstrate exhaustion or unavailability of administrative remedies, the Court recommends that summary judgment be granted in Defendants' favor on Plaintiff's denial of food claim.

### iii.   Alleged Use of Christian Materials in A2A Class

In support of his exhaustion argument, Plaintiff points to the group complaint he wrote in December 2017, arguing that it raised his religious discrimination claim. (*See* Resp. at 13.) The group complaint, however, did not allege religious discrimination. (*See* Dkt. # 169-4 at 98-99.) Therefore, the Court recommends that Defendants' motion for summary judgment on this claim be granted.

### iv.   Alleged Use of Racial Slurs by Ms. Hubbs

Plaintiff alleges that after he wrote the group complaint, Ms. Hubbs began calling him a "nigger" and a "devil worshiping nigger." (Am. Compl. at 22-23.) Plaintiff relies on the December 2017 infraction to argue that he exhausted his administrative remedies for this claim.

1   (Resp. at 13.) However, he was infracted *before* he claims Ms. Hubbs began using racial slurs.

2   Therefore, he cannot rely on the infraction to claim exhaustion. The Court recommends that

3   summary judgment be granted in Defendants' favor on this claim.

4                        v.    Alleged Threats by Ms. Hubbs

5          Plaintiff does not respond to Defendants' argument that he failed to exhaust his claim that

6   Ms. Hubbs threatened to poison his food. (*See generally* Resp.) The Court thus recommends

7   granting summary judgment in Defendants' favor on this claim.

8                        vi.    Alleged Threat by Ms. Hubbs's Daughter

9          Plaintiff argues that he could not grieve the alleged threat by Ms. Hubbs' daughter

10  because of the December 2017 infraction by Ms. Hubbs, citing Attachments 74, 75, and 77.

11  (Resp. at 13.) There is no basis to conclude that Ms. Hubbs' infraction prohibited Plaintiff from

12  grieving the alleged threat by her daughter, particularly given that the infraction was resolved in

13  January 2018 (*see* dkt. # 169-4 at 104) and the alleged threat was made in April 2018. (Am.

14  Compl. at 31.) Furthermore, the attachments do not establish exhaustion or the unavailability of

15  administrative remedies. Attachment 74 appears to be the January 2018 disciplinary hearing

16  appeal decision; Attachment 75 includes OMNI records, a grievance filed by another inmate, and

17  an unsworn declaration from another prisoner; and Attachment 77 is a kite. (Dkt. # 169-3 at 23;

18  Dkt. # 169-4 at 104-12.) The Court thus recommends granting summary judgment to Defendants

19  on Plaintiff's retaliation claim against Ms. Hubbs' daughter.

20                    *4.    Summary of Exhaustion*

21         Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that

22  Defendants have satisfied their burden of establishing Plaintiff failed to exhaust his available

23  administrative remedies for his: (1) rape/sexual harassment claims against Officer Gonzalez,

CPM Sundberg, CUS Buttice, CUS Pease, and Officer Dunleavy; (2) denial of food claim against Ms. Hubbs, CUS Buttice, CPM Sundberg, and Mr. Thrasher; (3) religious discrimination claim against Ms. Hubbs; (4) racial discrimination and retaliation claims against Ms. Hubbs based on the alleged use of racial slurs and threat to poison Plaintiff's food; and (5) retaliation claim against Ms. Hubbs' daughter. The Court recommends that these claims be dismissed without prejudice.

Defendants have not shown that they are entitled to summary judgment based on a failure to exhaust Plaintiff's racial discrimination and retaliation claims against Ms. Hubbs based on her alleged conduct while teaching the A2A class and the December 28, 2017 infraction. As Defendants do not brief the merits, the Court recommends denying summary judgment on these claims.

## C.    Personal Participation

Defendants move for summary judgment on several claims based on the lack of evidence of personal participation. To establish a § 1983 claim, a plaintiff must show how each defendant personally participated in causing the alleged harm. *Arnold*, 637 F.2d at 1355. Where a defendant does not directly cause the alleged harm, he or she may be liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014) (quoted source omitted). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-94 (1978) (section 1983 liability cannot be established solely on the basis of *respondeat superior*).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes:

(1) Mr. Thrasher, Mr. Gonzalez, and Ms. Schneider were not involved in the rejection of *The Devil's Notebook*. (Schneider Decl. at ¶ 3.)

(2) Mr. Thrasher, Mr. Gonzalez, Ms. Schneider, and Chaplain Fischer were not involved in the rejection of the *Encyclopedia of Hell*. (*Id.*; Fischer Decl. at ¶ 6.)

(3) Ms. Patzkowski, Ms. Ridenour, Ms. Schettler, Mr. Muecke, Mr. Roberts, Ms. Schneider, Ms. Aiyeku, Chaplain Ivey, Mr. Caldwell, Mr. Mink, and Ms. Romine were not involved in the rejection of *The Most Gruesome Hauntings*. (*See* Baker Decl. at ¶ 3; Schneider Decl. at ¶ 8; Dkt. # 150-1 at 4.) Plaintiff asserts many of these Defendants admitted to personal participation in their discovery responses (Resp. at 3-4), but after careful review, the Court concludes that this assertion is not born out by the record.

(4) Ms. Baker, Ms. Ridenour, Ms. Schettler, Mr. Muecke, Mr. Roberts, Ms. Aiyeku, Chaplain Ivey, Superintendent Holbrook, Mr. Caldwell, Mr. Mink, and Ms. Romine were not involved in the rejection of the *Grimorium Verum*. (*See* Patzkowski Decl. at ¶ 7; Schneider Decl. at ¶¶ 5-6; Resp. at 43.) Plaintiff again claims that many of these Defendants admitted full or partial participation in their discovery responses (Resp. at 3-4), but the record does not support this assertion.

(5) Superintendent Holbrook and Officer Gonzalez were not involved in the rejection of the religious items Plaintiff requested in July 2017. (Holbrook Decl. at ¶ 5; Gonzalez Decl. at ¶ 4.) Plaintiff cites Attachments 31 and 32 (Resp. at 6), but these exhibits do not support his claim of personal participation. Attachment 31 is a grievance from January 2017, which does not establish personal participation in the alleged denial of religious items in July 2017, and Attachment 32 is an illegible search report form. (*See* Dkt. # 169-2 at 86-90.)

1        (6) Chaplain Ivey should not be held liable for rejecting the religious items discussed in

2  Grievance # 17637188. Chaplain Ivey did not confiscate any religious items from Plaintiff. (Ivey

3  Decl. at ¶ 6.) His only involvement was providing input for the Level II grievance response,

4  which directed Plaintiff to follow DOC policy to obtain permission to have his requested items in

5  the IMU. (Dkt. # 145-1 at 4.) Although Plaintiff claims he attempted to follow the directions in

6  the grievance response, he asserts DOC Headquarters did not respond to his letters. (Resp. at

7  5-6.) There is no evidence that Chaplain Ivey knew or reasonably should have known that his

8  instructions to Plaintiff to follow established DOC policy would have resulted in the alleged

9  constitutional injury. *See Tatum*, 768 F.3d at 817. Accordingly, there is insufficient evidence of

10  personal participation to sustain a § 1983 claim against Chaplain Ivey.

11        (7) Ms. Hubbs was not involved in the events related to Plaintiff's hair. (Hubbs Decl. at

12  ¶ 5.) Although Plaintiff alleges custody staff acted at Ms. Hubbs' direction, there is no indication

13  Plaintiff's allegation is based on personal knowledge. Therefore, Plaintiff fails to create a

14  genuine dispute of material fact that would defeat summary judgment. *See Keenan*, 83 F.3d at

15  1090 n.1 (verified complaint may be treated as affidavit to oppose summary judgment only to the

16  extent it is based on personal knowledge); *Hernandez*, 343 F.3d at 1112 (unsupported conjecture,

17  conclusory statements, and allegations based merely on a party's belief are insufficient to oppose

18  summary judgment).

19        (8) Mr. Thrasher should not be held liable for the alleged violations related to Plaintiff's

20  hair. He responded to Plaintiff's Level III grievance on this issue after the alleged constitutional

21  violation had already occurred and Plaintiff had cut his hair. Therefore, he did not cause the

22  harm. *See, e.g.*, *Gates v. Legrand*, No. 16-401, 2019 WL 5295560, at *5 (D. Nev. Aug. 29, 2019)

23  ("after-the-fact knowledge of an alleged constitutional violation, which was already remedied,

1     cannot rise to the level of participation required for a § 1983 suit"); *Bradberry v. Nev. Dep't of*

2     *Corr's*, No. 11-668, 2013 WL 4702953, at *15-16 (D. Nev. Aug. 30, 2013) (a supervisor cannot

3     be liable for after-the-fact complaint of alleged constitutional violations or after-the-fact

4     knowledge of the event).

5          The Court recommends that the above-named Defendants be granted summary judgment

6     on all these claims.

7          Defendants also argue that Chaplain Fischer cannot be held liable for his role in the

8     rejection of *The Devil's Notebook* because he did not have the authority to reject the book and

9     merely gave his opinion that the book did not comply with the DOC's rules. (Mot. at 9-10; *see*

10    *also* Fischer Decl. at ¶ 5.) A reasonable jury, however, could conclude that the mailroom would

11    not have rejected the book if Chaplain Fischer had found that it complied with the rules, and that

12    their rejection was the reasonably foreseeable result of his opinion. *See Tatum*, 768 F.3d at 817.

13    Accordingly, Chaplain Fischer should not be granted summary judgment based on a lack of

14    personal participation.

15        **D.**      **RLUIPA Claims**

16          Defendants seek summary judgment on Plaintiff's RLUIPA claims. RLUIPA provides in

17    relevant part:

18          No government shall impose a substantial burden on the religious exercise of a
            person residing in or confined to an institution, . . . unless the government

19          demonstrates that imposition of the burden on that person . . . (1) is in furtherance
            of a compelling governmental interest; and (2) is the least restrictive means of

20          furthering that compelling governmental interest.

21    42 U.S.C. § 2000cc-1(a). A plaintiff bears the initial burden under RLUIPA of demonstrating a

22    religious exercise impinged upon by the government, and that the government's conduct

23    imposed a substantial burden on that religious exercise. *Greene v. Solano Cty. Jail*, 513 F.3d

982, 987 (9th Cir. 2008); *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). If a plaintiff succeeds in that prima facie showing, the burden shifts to the government to establish that the challenged practice furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc-2(b); *Green*, 513 F.3d at 986.

However, "RLUIPA does not allow for damages against individuals sued in their official or individual capacities . . . ." *Woods v. Staton*, 715 Fed. App'x 768 (9th Cir. 2018) (citing *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (RLUIPA does not authorize lawsuits against government employees in their individual capacity); *Holley v. Cal. Dep't of Corr's*, 599 F.3d 1108, 1114 (9th Cir. 2010) ("The Eleventh Amendment bars [an inmate's] suit for official-capacity damages under RLUIPA.")). As Plaintiff is proceeding only against individual Defendants, he cannot obtain monetary damages against any Defendant based on RLUIPA. In addition, Plaintiff's request for copies of *The Devil's Notebook* and the *Grimorium Verum* (Compl. at 47) is moot because the DOC now allows him to maintain copies of these books.[15] As there is no available relief for the Court to grant, the Court recommends that summary judgment be granted in Defendants' favor on Plaintiff's RLUIPA claims.

### E.    Free Exercise Claims Based on the Rejection of Religious Materials

Defendants move for summary judgment on Plaintiff's First Amendment free exercise claims against: (1) Chaplain Fischer for the rejection of *The Devil's Notebook*; (2) Ms. Baker, Superintendent Holbrook, and Mr. Gonzalez for the rejection of *The Most Gruesome Hauntings*; (3) Ms. Patzkowski, Mr. Gonzalez, and Ms. Schneider for the rejection of the *Grimorium Verum*;

---

[15] Plaintiff does not include *The Most Gruesome Hauntings* on his list of requested books. (*See* Compl. at 47.) He likewise does not request injunctive relief related to his other RLUIPA claims.

1    and (4) Chaplain Ivey for his response to Plaintiff's requests for religious materials from the

2    internet and addresses of Satanic organizations.

3          The First Amendment directs that "no law shall prohibit the free exercise of religion."

4    *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*,

5    482 U.S. 342, 348 (1987)). "In general, a plaintiff will have stated a free exercise claim if: (1)

6    'the claimant's proffered belief [is] sincerely held'; and (2) 'the claim [is] rooted in religious

7    belief, not in purely secular philosophical concerns.'" *Walker v. Beard*, 789 F.3d 1125, 1138 (9th

8    Cir. 2015) (quoting *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal quotation marks

9    and citation omitted)); *see also Shakur*, 514 F.3d at 885.

10         The free exercise right, however, "is necessarily limited by the fact of incarceration, and

11   may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."

12   *O'Lone*, 482 U.S. at 348. The impingement of an inmate's constitutional rights is valid if

13   reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

14   To make this determination, the Court balances the four factors set forth in *Turner*: (1) whether

15   there is a valid, rational connection between the prison regulation and the legitimate

16   governmental interest put forward to justify it; (2) whether alternative means of exercising the

17   right on which the regulation impinges remains open to prison inmates; (3) whether

18   accommodation of the asserted constitutional right will impact guards, other inmates, and the

19   allocation of prison resources; and (4) whether there is an absence of ready alternatives, versus

20   the presence of obvious, easy alternatives. *Id.* at 89-91; *see also Shakur*, 514 F.3d at 884

21   (applying *Turner* to a prisoner's First Amendment free exercise claim).

22         In this case, Plaintiff does not claim that any DOC policy is unconstitutional. Rather, he

23   challenges how those policies were applied to his requested material. A regulation that is valid

1    and neutral on its face may be invalid if it is applied to particular items in such a way that

2    negates the legitimate concerns. *See Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989); *see also*

3    *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (where a prisoner challenges the application of a

4    prison regulation, rather than the regulation itself, the question under the first *Turner* factor is

5    whether the regulation, as applied to the prisoner, is "reasonably related to legitimate penological

6    interests" (quoting *Turner*, 482 U.S. at 89)). With this authority in mind, the Court turns to the

7    specific issues in this case.

8         *1.    Rejection of The Devil's Notebook*

9         At the request of the mailroom, Chaplain Fischer reviewed *The Devil's Notebook* and

10   concluded that it violated DOC Policy 450.100 because it advocated violence, specifically citing

11   a hymn that celebrated murdering Christians. Defendants argue Chaplain Fischer is entitled to

12   qualified immunity for rendering this opinion. (Mot. at 10.)

13        The Ninth Circuit has held that "when a public official acts in reliance on a duly enacted

14   statute or ordinance, that official ordinarily is entitled to qualified immunity" unless the

15   ordinance is "patently violative of fundamental constitutional principles." *Dittman v. California*,

16   191 F.3d 1020, 1027 (9th Cir. 1999); *see also Grossman v. City of Portland*, 33 F.3d 1200, 1210

17   (9th Cir. 1994); *Brown v. Mason*, 288 Fed. App'x 391, 392-93 (9th Cir. 2008) (prison officials

18   entitled to qualified immunity if they act pursuant to official prison policy if the policy is not

19   "patently violative of constitutional principles"). Here, there is no indication the DOC policy at

20   issue is patently violative of fundamental constitutional principles.

21        Plaintiff nevertheless argues that summary judgment should be denied because rejecting

22   the entire book because of one song was an "exaggerated response." (Resp. at 3.) This argument

23   raises the fourth *Turner* factor, which looks to whether the prison has an easy alternative that will

accommodate the prisoner's rights at *de minimis* cost to the valid penological interests. *Turner*, 482 U.S. at 90-91. Defendants maintain that if any part of an incoming publication is found to undermine legitimate penological interests, the entire publication may be rejected. (Mot. at 13 (citing *Thornburgh*, 490 U.S. at 418-19).) In *Thornburgh*, the Supreme Court determined that the prison's "all-or-nothing rule" regarding accepting or rejecting publications was not an "exaggerated response" based on evidence that prison authorities reasonably feared that "tearing out the rejected portions and admitting the rest of the publication would create more discontent than the current practice . . . ." 490 U.S. at 418-19.

Numerous courts have relied on *Thornburgh* to uphold "all-or-nothing" policies in the face of arguments that prison authorities should tear out or redact offending portions of incoming publications. *See*, *e.g.*, *Murchison v. Rogers*, 779 F.3d 882, 893-94 (8th Cir. 2015) (prisoner's proposal to tear out specific pages of publications containing prohibited material would not have *de minimis* costs); *Shabazz v. Parsons*, 127 F.3d 1246, 1249 (10th Cir. 1997) (approving of prison's "all-or-nothing" policy in light of evidence showing that redacting or removing rejected portions of publications would be burdensome); *Keys v. Torres*, 737 Fed. App'x 717, 720 (5th Cir. 2018) (rejecting proposal to remove offensive portions of a publication and deliver remainder to inmate); *Lindell v. McCaughtry*, 115 Fed. App'x 872, 879 (7th Cir. 2004) ("[W]e are unwilling to say that the DOC should be required to redact publications when the Supreme Court [in *Thornburgh*] approved the Federal Bureau of Prisons' retention of the 'all or nothing' rule, which bans the entire publication if anything is found that may threaten security and order."); *Baasi v. Fabian*, No. 09-781, 2010 WL 924384, at *15 (D. Minn. Mar. 11, 2010) (approving of "all or nothing" regulation); *McCormick v. Werholtz*, No. 07-2605, 2009 WL 5210845, at *7 (D. Kan. Dec. 23, 2009) (holding that removing rejected portions of publications

1    was not a *de minimis* alternative measure because to make such accommodation for all inmates

2    would "require an enormous additional expenditure of resources"); *Ray v. Williams*, No. 04-863,

3    2005 WL 697041, *8 (D. Or. Mar. 24, 2005) (rejecting redaction as a viable alternative to the

4    "all-or-nothing" approach).

5        Given this authority, it would not have been clear to a reasonable official that

6    withholding *The Devil's Notebook* instead of redacting or tearing out the offending pages was

7    unlawful. *See Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) ("An officer cannot be said to have

8    violated a clearly established right unless the right's contours were sufficiently definite that any

9    reasonable official in the defendant's shoes would have understood that he was violating it.").

10   Accordingly, the Court recommends granting summary judgment to Chaplain Fischer on this

11   claim based on qualified immunity.

12                    2.    *Rejection of The Most Gruesome Hauntings*

13       Ms. Baker rejected *The Most Gruesome Hauntings* in accordance with the DOC policy

14   prohibiting publications from entities that are not publishers, vendors, or approved nonprofits. As

15   Defendants argue, this policy does not violate the First Amendment. *Prison Legal News v.*

16   *Lehman*, 272 F.Supp.2d 1151, 1160-61 (W.D. Wash. 2003) (upholding DOC's publisher-only

17   policy). Plaintiff nevertheless argues that the entity that mailed him the book, LGBT Books for

18   Prisoners, is an approved nonprofit, citing Attachment 6, which shows that it was approved as of

19   June 2019. (Resp. at 2, 54.) This evidence, however, does not create a genuine dispute of

20   material fact as to whether the nonprofit was approved at the time Ms. Baker rejected *The Most*

21   *Gruesome Hauntings* in 2017. Accordingly, the Court recommends granting summary judgment

22   to Defendants on this claim.

23

1          *3.      Rejection of the Grimorium Verum*

2          Ms. Patzkowski rejected the *Grimorium Verum* after determining that it contained

3   "instructions on rituals using human blood, skulls, and bones; sacrificing animals (goats,

4   roosters, hens, pigeons); instructions on using knives and needles for certain rituals; and mind

5   manipulation and power over females using rituals and potions" and was therefore prohibited

6   under DOC Policy 450.100. After considering Plaintiff's argument that the objectionable

7   information in the *Grimorium Verum* is similar to that of *The Satanic Bible*, which was on the

8   DOC's approved publications list, Mr. Gonzalez upheld the rejection because it posed "a threat

9   to legitimate penological objectives if the instructions [in the book] were carried out in a facility

10  setting." (Resp. at 43.)

11         In *Jackson v. Patzkowski*, Judge Mendoza analyzed whether the rejection of the

12  *Grimorium Verum* was "reasonably related to legitimate penological interests." No.

13  4:17-cv-5189-SMJ, Dkt. # 169 at 14 (E.D. Wash. Nov. 17, 2017) (quoting *Turner*, 482 U.S. at

14  89). Judge Mendoza focused on Ms. Patzkowski's argument that rejecting the book served the

15  legitimate penological interests of security, order, and rehabilitation:

16         Patzkowski suggests that allowing Jackson to possess *Grimorium Verum* could
           impose some unspecified and unsubstantiated risk on guards and other inmates.
17         [citation omitted]. This is equivalent to "safety concerns because . . . [t]he Satanic
           Bible advocates violence, manipulation, disregard for authority and revenge."
18         *Indreland v. Yellowstone Cty. Bd. of Comm'rs*, 693 F.Supp.2d 1230, 1241
           (D. Mont. 2010) (internal quotation marks omitted). While some courts have
19         upheld this justification and concluded that banning the Satanic Bible serves
           legitimate penological interests, some courts have ruled the opposite. *See id.* at
20         1241-42 (collecting cases). After reviewing the decisions of courts around the
           country, this
21         Court tends to agree that banning the Satanic Bible is tenuous under the First
           Amendment, though the analysis depends on the facts of each case. Applicable
22         prison policy appears to confirm this conclusion by expressly allowing inmates,
           including Jackson, to possess the Satanic Bible. *See* ECF No. 128-1 at 15. Thus,
23         the Court will assume, without deciding, that the First Amendment would prohibit
           Patzkowski from rejecting Jackson's incoming mail containing the Satanic Bible.

> The question thus becomes: what constitutionally meaningful distinction exists between *Grimorium Verum*—a Satanist ritual book—and the Satanic Bible itself? What risk does the former impose that the latter does not? Why would the First Amendment tolerate banning the former but not the latter? The record reveals no basis for drawing such distinctions.
>
> In sum, the record does not identify how rejecting *Grimorium Verum* in any way advances the legitimate penological interests of security, order, and rehabilitation. Thus, a reasonable jury could find no "valid, rational connection" between the challenged action and the proffered justification. *See Jones*, 791 F.3d at 1032 n.5 (quoting *Ward*, 1 F.3d at 876). Rejecting *Grimorium Verum* is not "reasonably related" to the legitimate penological interests of security, order, and rehabilitation. *O'Lone*, 482 U.S. at 349.

*Id.* at 15-16. Having reached this conclusion, Judge Mendoza determined that Ms. Patzkowski was not entitled to judgment as a matter of law on Plaintiff's First Amendment claim. *Id.* at 16.

Defendants do not attempt to revisit Judge Mendoza's conclusion that rejecting the *Grimorium Verum* was not reasonably related to legitimate penological interests under *Turner*. Instead, they argue that Ms. Patzkowski, Mr. Gonzalez, and Ms. Schneider are entitled to qualified immunity because no clearly established law precluded them from rejecting the book. (*See* Mot. at 13.)

Under the second prong of the qualified immunity analysis, the Court must determine whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted. *Saucier*, 533 U.S. at 202; *see also Kisela*, 138 S.Ct. at 1153 ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765, 1774 (2015) (internal quotation marks and quoted source

1    omitted). The inquiry "must be undertaken in light of the specific context of the case, not as a

2    broad general proposition." *Saucier*, 533 U.S. at 201.

3            "Because the focus is on whether the [official] had fair notice that [his or her] conduct

4    was unlawful, reasonableness is judged against the backdrop of the law at the time of the

5    conduct." *Kisela*, 138 S.Ct. at 1152 (quoted source omitted, alteration added). The Supreme

6    Court's "caselaw does not require a case directly on point," but "existing precedent must have

7    placed the statutory or constitutional question beyond debate." *Id.* (quoted source omitted). The

8    salient question is whether the state of the law at the time of the alleged constitutional violation

9    gave prison officials fair warning that their decision was unconstitutional. *Hope v. Pelzer*, 536

10   U.S. 730, 741 (2002). It is the plaintiff's burden to establish that the law was clearly established

11   at the time of the incident. *See Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated

12   in part*, 661 F.3d 1201 (9th Cir. 2011).

13           Defendants argue that they did not have fair warning it was unconstitutional to reject the

14   *Grimorium Verum* because several courts had upheld the rejection of other Satanic books that

15   encourage violent acts and human sacrifice. (Mot. at 13 (citing *McCorkle v. Johnson*, 881 F.2d

16   993, 995 (11th Cir. 1989) (per curiam) (upholding exclusion of Satanic publications, including

17   *The Satanic Bible*); *Carpenter v. Wilkenson*, 946 F.Supp.522, 530 (N.D. Ohio 1996) (prohibiting

18   possession of *The Satanic Bible* was reasonably related to legitimate penological interests); *Doty

19   v. Lewis*, 995 F.Supp.1081, 1086-88 (D. Ariz. 1998) (affirming ban on Satanic books in high

20   security unit given that they advocated human sacrifice, taking advantage of others, and violent

21   retaliation, among other things)).) Based on this authority, the Court agrees that a reasonable

22   official at the time would not have known that rejecting the *Grimorium Verum* violated

23   Plaintiff's constitutional rights. Plaintiff nevertheless argues that Judge Mendoza's decision

1    precludes qualified immunity. (Resp. at 3.) However, Judge Mendoza rendered his decision *after*

2    Defendants rejected the book and therefore his decision did not put them on notice. The Court

3    recommends that summary judgment be granted in Defendants' favor on this claim.

4            *4.    Chaplain Ivey's Responses to Plaintiff's Requests*

5            Defendants argue they are entitled to summary judgment on Plaintiff's claims that

6    Chaplain Ivey violated his First Amendment rights in responding to his requests for religious

7    literature and addresses. (Reply at 7.) First, they contend they have no constitutional obligation

8    to provide Plaintiff with religious items or literature. (*Id.*) Indeed, courts have held that prisons

9    have no obligation to purchase religious materials for prisoners at their own expense. *Indreland*

10   *v. Yellowstone Cty. Bd. of Commr's*, 693 F.Supp.2d 1230, 1242 (D. Mont. 2010) (collecting

11   cases); *see also Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 925 (9th Cir.

12   2011) (DOC does not have "duty to provide religious materials and services to inmates; rather,

13   the DOC must provide reasonable opportunities to exercise religious freedom"). Thus, the Court

14   recommends that Plaintiff's claim that Chaplain Ivey refused to provide Satanic materials from

15   the internet be dismissed.

16           Second, Defendants maintain that Chaplain Ivey is entitled to qualified immunity on the

17   claim related to Satanic addresses. (Reply at 7.) The Court agrees. DOC Policy 560.200 did not

18   require Chaplain Ivey to provide Plaintiff with mailing addresses or another way to contact these

19   Satanic organizations. *See* DOC Policy 560.200 at 18 ("When an offender's faith is not

20   represented through the facility chaplain or volunteers, the Chaplain/designee *may* assist the

21   offender in contacting a religious leader with the appropriate credentials from the faith group.")

22   (emphasis added); *id.* ("Lack of volunteers from a particular faith group may restrict the ability

23   to provide consistent programming or materials. In the event no volunteers are available,

1    *offenders* may request faith group materials through recognized organizations.") (emphasis

2    added). As there is no indication that DOC Policy 560.200 is patently violative of fundamental

3    constitutional principles, the Court recommends that summary judgment on this claim be granted

4    based on qualified immunity. *See Dittman*, 191 F.3d at 1027; *Grossman*, 33 F.3d at 1210.

5    ### F.    Retaliation

6    The First Amendment protects prisoners' right to file grievances and pursue civil rights

7    litigation in federal court without retaliation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

8    2012); *Silva v. DiVittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a

9    viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

10    state actor took some adverse action against an inmate (2) because of (3) that prisoner's

11    protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

12    rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v.

13    Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

14    "The prisoner must show that the type of activity in which he was engaged was

15    constitutionally protected, that the protected conduct was a substantial or motivating factor for

16    the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological

17    interest." *Quiroz v. Horel*, 85 F.Supp.3d 1115, 1124 (N.D. Cal. 2015) (citing *Hines v. Gomez*,

18    108 F.3d 265, 267-68 (9th Cir. 1997)); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.

19    1995) (plaintiff bears burden of pleading and proving the absence of legitimate correctional goals

20    for the conduct of which he complains). Additionally, "a plaintiff who fails to allege a chilling

21    effect may still state a claim if he alleges he suffered some other harm." *Brodheim v. Cry*, 584

22    F.3d 1262, 1269 (9th Cir. 2009).

23

Absent direct evidence, retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). Circumstantial evidence of motive that can defeat summary judgment usually includes: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual." *McCollum v. Cal. Dep't of Corr's & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (internal quotation marks and citation omitted). However, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew of plaintiff's prior lawsuit or that defendants' disparaging remarks were made in reference to prior lawsuit).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

Plaintiff brings retaliation claims against CUS Buttice, CPM Sundberg, CUS Pease, and Officer Dunleavy. The Court discusses each claim below.

### 1. *CUS Buttice*

Plaintiff alleges CUS Buttice retaliated against him for filing PREA complaints against Officer Gonzalez by damaging his property and making false accusations against him. (Am.

Compl. at 19-20.) Plaintiff also alleges CUS Buttice retaliated against him for bringing the group

complaint against Ms. Hubbs by ordering custody staff to require him to take down his hair. (*See*

*id.* at 22-26, 32.)

Defendants argue there is no evidence CUS Buttice was aware Plaintiff engaged in

protected activity or that his alleged actions against Plaintiff did not advance legitimate

penological goals. (Mot. at 21-22.) There is no evidence CUS Buttice was aware Plaintiff made

PREA hotline calls to report the alleged sexual harassment by Officer Gonzalez. Plaintiff points

to evidence that CUS Buttice knew in December 2016 that Plaintiff filed a grievance about

Officer Gonzalez and a tort claim regarding destroyed property (Resp. at 10 (citing Dkt. # 169-3

at 72-73)), but this evidence does not support his claim that CUS Buttice retaliated against him

for filing PREA complaints. There is also no evidence CUS Buttice knew about the group

complaint. Thus, viewing the evidence in Plaintiff's favor, it is apparent Plaintiff's claim that

CUS Buttice retaliated against him *because* he made PREA complaints and participated in the

group complaint is mere speculation. *See Wood*, 753 F.3d at 904-05 (affirming grant of summary

judgment where there was no evidence defendants knew of plaintiff's prior lawsuit); *Hernandez*,

343 F.3d at 1112 (finding unsupported conjecture is insufficient to oppose summary judgment).

The Court recommends that summary judgment be granted in Defendants' favor on these claims.

### 2.    *CPM Sundberg*

Plaintiff alleges CPM Sundberg retaliated against him for filing PREA complaints against

Officer Gonzalez by moving him from IMU South to IMU North in December 2016. (Am.

Compl. at 19.) He also alleges CPM Sundberg told him to stop writing PREA complaints. (*Id.*)

Plaintiff further alleges CPM Sundberg retaliated against him for bringing the group complaint

1    against Ms. Hubbs by ordering custody staff to require him to take down his hair. (*See id.* at

2    22-26, 32.)

3    With respect to the first claim, Defendants argue that CPM Sundberg did not know prior

4    to the filing of this lawsuit that Plaintiff had filed PREA complaints. (Mot. at 21-22; Sundberg

5    Decl. at ¶¶ 4-5.) Viewing the evidence in Plaintiff's favor, however, the Court must credit his

6    verified statement that CPM Sundberg told him to stop filing PREA complaints. Nevertheless,

7    assuming CPM Sundberg knew of the alleged sexual harassment by Officer Gonzalez, no

8    reasonable jury could conclude that moving Plaintiff to a different unit away from Officer

9    Gonzalez was an adverse action that would chill the First Amendment rights of a person of

10   ordinary firmness. *See Rhodes*, 408 F.3d at 567-68 (retaliation claim requires adverse action).

11   With respect to the second claim, there is no evidence CPM Sundberg knew about the

12   group complaint. Thus, viewing the evidence in Plaintiff's favor, it is apparent Plaintiff's claim

13   that CPM Sundberg retaliated against him *because* he participated in the group complaint is mere

14   speculation. *See Wood*, 753 F.3d at 904-05; *Hernandez*, 343 F.3d at 1112.

15   The Court recommends granting summary judgment to Defendants on these claims.

16              *3.      CUS Pease*

17   Plaintiff alleges CUS Pease "harassed" him and destroyed his property in retaliation for

18   filing grievances and PREA complaints. (Am. Compl. at 19-20; *see also* Dkt. # 169-3 at 101-04

19   (Grievance # 17624968 filed 1/11/2017).) He also alleges CUS Pease told him to "shut the fuck

20   up and stop writing grievances" and then denied him lunch. (Am. Compl. at 20; *see also* Dkt.

21   # 169-3 at 96-99 (Grievance # 17625918 filed 1/25/2017).)

22   Defendants first argue that Plaintiff did not engage in protected activity and that even if

23   he did, there is no evidence CUS Pease was aware of such activity. (Mot. at 21-22.) Although

1    there is no evidence CUS Pease knew of Plaintiff's PREA hotline calls at the time of the alleged

2    retaliation in December 2016 and January 2017, there is no dispute Plaintiff filed numerous

3    grievances while in the WSP IMU, and CUS Pease's alleged directive to "stop writing

4    grievances" is sufficient to establish CUS Pease acted "because" of Plaintiff's protected

5    activity.[16]

6         Defendants also argue that there is no competent evidence CUS Pease's actions did not

7    advance legitimate penological goals. (Mot. at 21-22.) But Plaintiff has alleged that CUS Pease

8    harassed him, destroyed his property, and denied him lunch in retaliation for filing grievances.

9    These allegations are sufficient to state a claim, and Defendants have failed to proffer any reason

10   why harassing Plaintiff, destroying his property, or denying him lunch served legitimate

11   penological goals. Accordingly, Defendants have not satisfied their burden of demonstrating they

12   are entitled to judgment as a matter of law, and the Court recommends that summary judgment

13   be denied on this claim.

14                    *4.    Officer Dunleavy*

15        Plaintiff alleges Officer Dunleavy "harassed" him and destroyed his property in

16   retaliation for filing grievances and PREA complaints. (Am. Compl. at 19-20; Dkt. # 169-3 at

17   101-04.) Defendants argue there is no evidence Officer Dunleavy knew Plaintiff had engaged in

18   protected activity prior to allegedly harassing him and destroying his property. (Mot. at 22.) In

19   response, Plaintiff points to a grievance he filed complaining about the destruction of his

20   property. (Resp. at 11 (citing Dkt. # 169-3 at 101-04).) But Plaintiff filed this grievance after the

21   alleged retaliation. (*See* Am. Compl. at 19-20 (alleging that he filed Grievance # 17624968 to

22   complain about the alleged retaliation).) As such, it does not support Plaintiff's conclusory

23

---

[16] CUS Pease appears to have been aware of a PREA hotline call Plaintiff made in July 2017. (*See* Dkt. # 169-3 at 54.)

REPORT AND RECOMMENDATION - 58

allegation that Officer Dunleavy acted *because* of Plaintiff's protected conduct. *See Wood*, 753 F.3d at 904-05; *Hernandez*, 343 F.3d at 1112. Accordingly, the Court recommends that summary judgment be granted in Defendants' favor on this claim.

## G.   Destruction of Property

Defendants seek summary judgment on Plaintiff's claims that they destroyed his property. (Mot. at 23-24.) An unauthorized intentional deprivation of a prisoner's property does not constitute a violation of the Due Process Clause if a meaningful post-deprivation remedy for the loss is available under state law. *Hudson v. Palmer*, 468 U.S. 517, 534 (1984); *see also Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir. 2002). In this case, Washington State provides a meaningful post-deprivation remedy for the intentional or negligent loss of property by state agents and employees. In Washington, a plaintiff may file a tort claim against the State for unlawful loss or destruction of inmate property. RCW 72.02.045; RCW 4.92.090-100; *see Franklin v. State Welfare Div.*, 662 F.2d 1337, 1345-46 (9th Cir. 1981); *see also Jeffries v. Reed*, 631 F.Supp.1212, 1216 (E.D. Wash. 1986). As Plaintiff has an adequate state post-deprivation remedy and could file a tort claim for alleged destruction of his personal property in the Washington State Courts, the Court recommends granting summary judgment to Defendants on this claim.

## H.   Claims Related to Enhanced Search Protocols

Plaintiff alleges Defendants violated his right to the free exercise of his religion and discriminated against him based on his religion and race by requiring him to take out his religious dreadlocks prior to being escorted from his cell. (*See* Am. Compl. at 23-24, 32.) Defendants argue Plaintiff's claims "fail under any legal theory" because CPM Sundberg and CUS Buttice acted for legitimate security reasons and not for discriminatory purposes. (Mot. at

1   23.) They also argue they are entitled to qualified immunity because Plaintiff did not have a

2   constitutional right to refuse to take his hair out so that IMU staff could conduct a thorough and

3   appropriate search. (*Id.*)

4        Pursuant to the enhanced search protocols implemented in the WSP IMU in January

5   2018, inmates with braids in their hair were required to take out their braids to allow for a full

6   search of their hair prior to being escorted from their cells. This policy did not apply to

7   dreadlocks, which were permitted in the IMU. Although Defendants maintain that Plaintiff had

8   braids in his hair, Plaintiff attests he had religious dreadlocks. (*See* Am. Compl. at 23-27.) The

9   Court must credit Plaintiff's evidence for purposes of Defendants' motion for summary

10  judgment.

11          *1.    Free Exercise*

12       With respect to Plaintiff's free exercise claim, Defendants do not dispute that Plaintiff's

13  hairstyle was rooted in sincerely held religious beliefs, and they fail to satisfy *Turner*'s

14  requirements to justify the impingement on Plaintiff's free exercise of religion. Viewing the

15  evidence in Plaintiff's favor, a rational jury could conclude that CPM Sundberg and CUS Buttice

16  acted arbitrarily and irrationally in applying the enhanced search policy to Plaintiff because he

17  had dreadlocks and the policy only applied to inmates with braids. Thus, even if there is a valid,

18  rational connection between the enhanced search rule and legitimate governmental interests, a

19  rational jury could conclude that the rule was applied to Plaintiff in such a way to negate those

20  legitimate concerns. *See Thornburgh*, 490 U.S. at 419 (facially valid regulation may be applied

21  in a way that negates legitimate concerns). Nevertheless, Plaintiff has not identified, and the

22  Court is not aware of any law that would have put CPM Sundberg and CUS Buttice on notice

23  that they were violating Plaintiff's constitutional rights under these circumstances. Therefore, the

Court recommends that summary judgment based on qualified immunity be granted to Defendants on Plaintiff's free exercise claim.

2.    *Equal Protection*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all person similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal citation omitted)). "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class"—that is, a plaintiff must show "that a defendant acted at least in part because of a plaintiff's protected status." *Id.* at 1082 (internal quotation marks omitted).

Although a jury could conclude that CPM Sundberg and CUS Buttice arbitrarily and irrationally applied the enhanced search policy to Plaintiff, there is no evidence that they did so because of Plaintiff's religion or race. *Cf. Serrano*, 345 F.3d at 1083 (finding sufficient evidence of racial motivation where prison official "made specifically, racially tinged remarks"). Plaintiff's conclusory allegations to the contrary are insufficient to create a genuine dispute of material fact. The Court recommends that summary judgment be granted in Defendants' favor on Plaintiff's religious and racial discrimination claims.

I.    **Interference with the Grievance Process**

Defendants move for summary judgment on Plaintiff's due process claims related to alleged interference with the grievance process. (Mot. at 23.) Indeed, these claims fail as a matter of law. Prisoners have a First Amendment right to meaningfully access the courts and to file

prison grievances. *See Lewis v. Casey*, 518 U.S. 343, 361-62 (1996); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). Prisoners do not, however, have standalone due process rights related to the administrative grievance process. *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Allen v. Wood*, 970 F.Supp.824, 832 (E.D. Wash. 1997); *Stewart v. Block*, 938 F.Supp.582, 588 (C.D. Cal. 1996). As there is no right to any particular grievance process, it is impossible for Plaintiff's due process rights to have been violated by the interference alleged in his complaint.

In his response, Plaintiff argues that the improper treatment of his grievances was retaliatory. (Resp. at 17-19.) But his complaint does not assert such a claim. (*See* Am. Compl. at 33-36.) As Plaintiff fails to raise a genuine dispute of material fact, the Court recommends that summary judgment be granted in Defendants' favor on his due process claims.

### J.    Remaining Claims

Plaintiff raised claims in his complaint that neither party addresses in their summary judgment briefing. When the nonmoving party fails raise a claim in opposition to a complete motion for summary judgment, they abandon that claim even if the moving party does not expressly discuss the claim in its motion. *See Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) (holding that plaintiff abandoned claim by failing to raise it in opposition to complete motion for summary judgment); *Shakur*, 514 F.3d at 982 (holding that *pro se* prisoner abandoned claim by failing to raise it in opposition to motion for summary judgement even though motion did not discuss claim). As Defendants seek summary judgment and dismissal with prejudice of all claims against them (*see* Mot. at 24), the Court recommends that all claims not expressly discussed in this Report and Recommendation be dismissed with prejudice.

# V.    CONCLUSION

The Court recommends that Defendants' motion for summary judgment (dkt. # 138) be GRANTED in part and DENIED in part. Specifically, the Court recommends that the motion be:

(1)    DENIED with respect to Plaintiff's racial discrimination and retaliation claims against Ms. Hubbs based on her conduct while teaching the A2A class and the December 28, 2017 infraction;

(2)    DENIED with respect to Plaintiff's First Amendment retaliation claim against CUS Pease;

(3)    GRANTED based on a failure to exhaust Plaintiff's rape/sexual harassment claims against Officer Gonzalez, CPM Sundberg, CUS Buttice, CUS Pease, and Officer Dunleavy; denial of food claims against Ms. Hubbs, CUS Buttice, CPM Sundberg, and Mr. Thrasher; religious discrimination claim against Ms. Hubbs; racial discrimination and retaliation claims against Ms. Hubbs based on the alleged use of racial slurs and threat to poison Plaintiff's food; and retaliation claim against Kara Hubbs; and

(4)    GRANTED with respect to all remaining claims.

The Court further recommends that the claims Plaintiff failed to exhaust be DISMISSED without prejudice, and that the other claims be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within

**fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on August 7, 2020.

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable Ricardo S. Martinez.

Dated this 14th day of July, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 64